UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDREA PETERSON,<br><br>   Plaintiff,<br><br>  v.<br><br>HVM L.L.C., et al.,<br><br>   Defendants. | Civ. No. 14-1137 (KM)(SCM)<br><br>OPINION |

  Plaintiff Andrea Peterson has moved for a preliminary injunction ordering several forms of relief. Some are not properly the subject of a preliminary injunction at all. Others seem to address harms that are not sufficiently connected to the alleged acts of the defendants. For the rest, I find that Peterson has not made a showing of irreparable harm. I will therefore deny the motion for a preliminary injunction.

**Background**

  **The LTL contract**

  This case stems from an alleged breach of a long-term lodging agreement between Peterson and a hotel. In 2009, plaintiff Andrea Peterson entered into a Long-Term Lodging Agreement with defendant HVM LLC (now Extended Stay America, or ESA). (LTL, 3) Under the agreement, ESA was to provide Peterson with lodging in one of its hotels, in exchange for which Peterson would pay $900 per month. (Compl., ¶ 2)[1]

---

[1]  In the copy of the agreement filed with this Court, the amount of the monthly lodging fee has been scratched out, rendering it illegible. The Complaint states that the rate was $900 per month (Compl., ¶ 2) and at a state court hearing the judge, reading from the agreement, stated that the amount was $900 per month. (Hearing, 7). I will therefore presume this to be the rate to which the parties agreed.

1

That contract stated that it would expire "3 months (90 days)" after the date of the contract, which would be approximately May 19, 2009.[2] (LTL, 1) However, the agreement also provided that the parties could renew their contract "for additional 3 months (90 day) periods." (LTL, 1) The agreement did not specify any particular method for renewing the contract (for instance, it did not stipulate that the renewal needed to be in writing). And Peterson does not explicitly allege that this contract was ever renewed. However, she does allege that ESA breached the contract in October of 2012. (Compl., 2). One is left to assume that the parties renewed the contract (or at least that Peterson alleges that they did) for subsequent 3-month periods on several occasions between May of 2009 and October of 2012.

The LTL also provided that either party could terminate the contract at any time by giving the other party 30 days' written notice. (*See* LTL, 3).

**The state court proceedings**

It appears that ESA attempted to exercise its option to terminate the agreement as early as June of 2012, when ESA initiated state court proceedings to remove Peterson from her room in their hotel. (NJ case number LT-9118-12) (Dkt. 10, Exh. D, 2) On July 18, 2012, ESA obtained a "warrant of removal" from a New Jersey state court. (Dkt. 10, Exh. D, 1) The warrant listed Peterson's address as "One Meadowlands Parkway, Room 507" in Secaucus. (Dkt. 10, Exh. D, 1) According to Peterson, though, she was not residing at that precise address in 2012. (Compl., ¶¶ 13)

ESA initiated a second suit and obtained another warrant of removal on September 10, 2012. (NJ case number LT-011864-12) (Compl., ¶¶ 8-9) This warrant of removal apparently listed Peterson's residence as "One Plaza Drive, Room 504" (not 507) in Secaucus. (Compl., ¶ 8) On September 14, 2012, ESA posted the notice of removal on the door of Peterson's room (which was

---

[2]   Three months, of course, is not quite the same as 90 days. While this uncertainty may create an issue later if Peterson attempts to recover damages, it is unimportant for present purposes.

apparently room 507). (Compl., ¶ 11) Sometime after that, it appears that a default judgment was entered against Peterson in this second case (No. LT-011864-12). (*See* Dkt. No. 10, Exh. F)

It appears that Peterson did become aware of at least this second notice of removal. Peterson's complaint states that "Defendants did not serve plaintiff." (Compl. ¶ 16; *see also* Affidavit, ¶ 6 ("I was never served summons.")). But she does aver that the warrant in case number LT-011864-12 was posted on the door of her room. (Compl., ¶ 11) She also recounts that on August 17, 2012, a letter was slid under her door with a return address of Superior Court of New Jersey, Law Division, Special Part. (Dkt. No. 10, Exh. C, ¶¶ 1-2) For reasons that are not clear, Peterson did not open the letter. Instead, she asked the hotel manager to mark the envelope "return to sender" and return it to the post office. She stated that she does not accept mail at the hotel address; she accepts mail only at a post office box. (Dkt. No. 10, Exh. C, ¶¶ 2-3)

In any case, on September 19, 2012, Peterson moved to dismiss both of ESA's state court suits against her. (Dkt. No. 10, Exh. C) The state court held a hearing on October 2, 2012. At that hearing, the Honorable Marybeth Rogers vacated the default judgment and dismissed case number LT-11864-12. (Dkt. No. 10, Exh. F) Judge Rogers, agreeing with Peterson, held that a clause in the LTL explicitly provided that the parties were not entering into a landlord/tenant relationship. (LTL, 2 ("[T]he parties acknowledge and agree that the legal relationship between HVM and the Lodger is that of a hotel manager and guest and that it is not the intention of the parties to create a lease within the meaning of the laws of this State.")). Because Peterson was not a tenant, the court (Special Civil Part, Landlord/Tenant Division) held that it lacked jurisdiction to issue a warrant of removal. (Dkt. No. 10, Exh. F) The court vacated the two warrants of removal and dismissed case number LT-11864-12. ESA then withdrew its complaint in case number LT-9118-12. (Dkt. No. 10, Exh. F)

**The lockout**

Peterson alleges that the next morning, October 3, 2012, the hotel manager told Peterson that he was "putting [Peterson] out of the hotel." (Compl., ¶ 23) That afternoon, the hotel locked Peterson out of her room by disabling her key-card access. (Compl., ¶ 25) According to Peterson, the hotel did not allow her to enter her room to collect her personal belongings until the next day, when she was escorted to her room by police. (Compl., ¶ 27-28)

Peterson filed suit in New Jersey state court, requesting a temporary restraining order and a preliminary injunction requiring the hotel to provide Peterson with lodging. (Compl., ¶ 30) The court held a hearing on Peterson's motions for injunctive relief on October 19, 2012. Judge Mary K. Costello denied Peterson's motions. (Hearing, 6)[3] Judge Costello held that Ms. Peterson had not shown that irreparable harm would result if an injunction did not issue. (Hearing, 6) She noted that the hotel had refunded Peterson's lodging fee for the month of October, and that Peterson had stayed in at least one hotel since being locked out of ESA. (Hearing, 7) Peterson's state court complaint was dismissed entirely on May 2, 2013. (Affidavit, ¶ 120)

**This federal lawsuit**

Peterson commenced this federal court action on October 16, 2013. (*See* Dkt. No. 1) She filed her complaint in the U.S. District Court for the Northern District of Georgia, where she has taken up residence. (*See* Dkt. No. 1; Georgia Order, 3)

The complaint names as defendants HVM L.L.C and Extended Stay America. (Compl., 1) She also named as defendants Centerbridge Partners LP, Paulson & Company, and Blackstone Real Estate Partners VI, each of which Peterson says owns an interest in ESA (Compl., 6).

---

[3]     Peterson has attached a transcript of this hearing. The transcript was not prepared by a certified court reporter. Rather, Peterson avers that she obtained a recording of the hearing from the Court, and prepared the transcript herself. (*See* Affidavit, ¶ 60) For purposes of this motion only I will assume that the transcript is accurate.

4

The complaint asserts a number of claims arising out of the hotel episode, including breach of contract, intentional infliction of emotional distress, and fraud. Peterson argues that the proceedings in state court violated her constitutional rights, including her rights to Equal Protection and Due Process. The Complaint requests damages stemming from the breach of contract itself, from subsequent events which she attributes to the defendants' breach of contract, for litigation costs, and for pain and suffering. (Compl., 27-28) Peterson also requests several forms of injunctive relief, including "[r]estoration of Plaintiff in comparable premises," and other orders designed to remedy the adverse effects these events have had on Peterson's access to credit.

In the Northern District of Georgia, the case was referred to United States District Judge Richard W. Story for an initial screening. (*See* Dkt. No. 9) In the course of his review, Judge Story determined that the Georgia long-arm statute did not permit the assertion of personal jurisdiction over the defendants. (Georgia Order, 6-8) Judge Story therefore ordered the case transferred to this District. (Georgia Order, 9)

**This motion for preliminary injunction**

In this court, as in State court, Peterson requested a temporary restraining order and a preliminary injunction. (Compl., 27-28; Dkt. Nos. 3, 30) On January 21, 2015, I denied Peterson's motion for a temporary restraining order, and administratively terminated her request for a preliminary injunction without prejudice. (*See* Dkt. No. 33) I explained that Peterson could renew her request for a preliminary injunction after the complaint was served and defendants had answered or moved to dismiss it.

On February 20, 2015, after the defendants moved to dismiss the complaint, Peterson filed a motion for injunctive relief. (See Dkt. No. 43) Peterson describes her motion as one for a hearing. I construe it as as a renewal of (and supplement to) Peterson's prior motions for a preliminary injunction (Dkt. Nos. 1, 30).

5

**Discussion**

### I.  The federal standard for preliminary injunctions

Peterson argues that this Court should apply the standard for issuing preliminary injunctions under New Jersey state law, rather than the standard under federal law. I disagree. In deciding a motion for a preliminary injunction, a district court applies the federal, not state, standard. "We utilize a federal standard in examining requests to federal courts for preliminary injunctions…[A]lthough the right upon which this cause of action is based is state-created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions." *Instant Air Freight Co. v. C.F. Air Freight*, Inc., 882 F.2d 797, 799 (3d Cir. 1989). This is true even in a diversity case in which a court is applying state substantive law. *See Figueroa v. Precision Surgical, Inc.*, 423 F. App'x 205, 207 (3d Cir. 2011) ("Although we apply state law to the substantive issues in this diversity action, *see Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), we utilize a federal standard in examining requests to federal courts for preliminary injunctions.") (internal quotations, footnote, and citations omitted).

I will therefore apply federal standards in determining whether a preliminary injunction should issue. Whether a preliminary injunction is warranted depends on four factors: (1) whether the moving party has a reasonable probability of success on the merits; (2) whether the moving party will suffer irreparable harm in the absence of preliminary relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Columbia Gas Transmission, LLC v. 1.01 Acres, More or Less in Penn Twp., York Cnty., Pa., Located on Tax ID #£4400028001500000000 Owned by Brown*, 768 F.3d 300, 315 (3d Cir. 2014). No one factor will require granting relief. Rather, a district court "should

endeavor to balance these four factors to determine if an injunction should issue." *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999).

Although all the factors are relevant, two are critical. A court may not grant injunctive relief, "regardless of what the equities seem to require," unless plaintiffs carry their burden of establishing both a likelihood of success and irreparable harm. *Adams*, 204 F. 3d at 484; *accord Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197 (3d Cir. 1990) (placing particular weight on the probability of irreparable harm and the likelihood of success on the merits, stating: "[W]e cannot sustain a preliminary injunction ordered by the district court where either or both of these prerequisites are absent." (quoting *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982)); *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir.1987); *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 151 (3d Cir.1984); *American Express*, 669 F.3d at 366, 374. *See also Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 21 (2008) (holding it was error to water down the irreparable harm requirement from "likelihood" to "possibility," even where likelihood of success was strong); *Talbert v. Corizon Medical*, --- F. App'x ----, 2015 WL 3544517 (3d Cir. June 8, 2015) (summarily affirming denial of preliminary injunction based on lack of irreparable harm). [4]

---

[4] I note in passing, however, that the state standard is fairly similar to the federal one, and probably would not dictate a different result. Under New Jersey law, the court is to consider four factors: (1) whether an injunction is necessary to prevent irreparable harm; (2) whether the legal right underlying the applicant's claim is unsettled; (3) whether the applicant has made a preliminary showing of a reasonable probability of ultimate success on the merits; and (4) the relative hardship to the parties in granting or denying injunctive relief. *Rinaldo v. RLR Inv.*, LLC, 904 A.2d 725, 730 (N.J. App. Div. 2006) (citing *Crowe v. De Gioia*, 447 A.2d 173 (N.J. 1982)). Because, as I find below, Peterson has not shown irreparable harm under the federal standard, she would not qualify for a preliminary injunction under the state standard, either. And indeed, a state court has already denied Ms. Peterson a temporary restraining order and a preliminary injunction, finding that she could not show irreparable harm. (Hearing, 5-7).

## II. The requested relief

Ms. Peterson has requested six categories of relief:

> 1) Payment of damages including pain and suffering, as well as the "full replacement costs of plaintiff household goods" sold in a storage facility auction, which Peterson says was necessitated by ESA's actions (Dkt. No. 30, ¶ 71 (A), (B), (C)(i));
>
> 2) Attorneys' fees and costs (Dkt. No. 30, ¶ 71(A), (B), (D) – (F)), including the costs that Peterson expects to incur to obtain her credit report and verify that it contains no negative references from the defendants (Dkt. No. 30, ¶ 71(C)(iii));
>
> 3) An order that ESA personnel refrain from "any discussion and or involvement in any affairs of plaintiff." (Dkt. No. 30, ¶ 71(I))
>
> 4) An order that ESA may not terminate its contract with Peterson (Dkt. No. 30, ¶ 71(F));
>
> 5) A letter from the Court to Peterson's creditors stating that the defendants are responsible for Peterson's debts to them (Dkt. No. 30, ¶ 71(C)(ii));
>
> 6) housing in comparable premises (Dkt. No. 30, ¶ 71(A));

The first four of these warrant only brief consideration. Damages and attorneys' fees are rarely, if ever, awarded as part of a preliminary injunction order. "We are satisfied that a preliminary injunction which ordered the payment of monies where the underlying contract is disputed, misconceives the equitable nature and purpose of an injunctive proceeding." *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1145 (3d Cir. 1982). Indeed, one of the prerequisites of a preliminary injunction is a showing of harm that, by its nature, *cannot* be redressed by money damages. *See* Part I, *supra*. I therefore deny Peterson's request that the court award damages or costs as part of a preliminary injunction.

Peterson also requests an order from this Court that the defendants may not discuss Peterson, or involve themselves in Peterson's affairs. This request finds no support in the record before me. Peterson has not demonstrated that

8

the defendants are discussing Peterson, or that the discussions are harming her. Nor has Peterson demonstrated, or even alleged, that the defendants are now involving themselves in her affairs in any way, aside from responding to this lawsuit.

Peterson additionally requests an order that the defendants may not terminate their contract with Peterson. I see no justification for this relief, which goes far beyond anything in the parties' contract. Even if it is ultimately found that ESA breached its contract with Peterson, I cannot see that it would be appropriate to deny ESA its contractual option to terminate, much less to force ESA to perform in perpetuity under a contract that was intended to last only 90 days and was terminable for any reason on 30 days' notice. Because this remedy would not be available even should Peterson prevail on the merits, ordering it on a preliminary basis would be doubly inappropriate. *Jones v. Sec'y Pennsylvania Dep't of Corr.*, 589 F. App'x 591, 594 (3d Cir. 2014) ("As the District Court noted, preliminary injunctions should not be granted when they…seek intermediate relief of a different character than the relief ultimately sought.") (citing *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945)).

Peterson's remaining two requests warrant somewhat closer scrutiny. She requests that the defendants provide her housing comparable to that provided for in the contract. Peterson also requests that the Court notify her creditors that ESA is responsible for Peterson's having gone into debt. Because Peterson is proceeding *pro se*, I will construe this latter request liberally as a request that the Court intervene to prevent any negative notations on Peterson's credit report while this litigation is pending.

Setting aside these issues as to the appropriateness of the requests for relief, I turn to the four preliminary injunction factors, focusing on irreparable harm.

### III. Irreparable harm

Irreparable harm is harm that "cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). This definition contains two important elements: first, the harm must be one that money damages cannot adequately remedy. *Instant Air*, 882 F.2d at 801. Second, the harm must be such that even an equitable remedy will not be adequate if withheld until the conclusion of the litigation. *Instant Air*, 882 F.2d at 801. To put it differently, the "the preliminary injunction must be the only way of protecting the plaintiff from harm." *Instant Air*, 882 F.2d at 801. Naturally, the burden is on the moving party to demonstrate that there is the potential for this type of harm. *Instant Air*, 882 F.2d at 801. Peterson has not made this showing. Indeed, her allegations, taken at face value, would not constitute such a showing if they were proven. Here I consider them without an evidentiary hearing.

#### a. The request for comparable housing

I begin by considering whether irreparable harm will result if I do not preliminarily enjoin ESA to place Peterson in comparable housing. That necessary showing has not been made, for multiple reasons.

First, Peterson has not argued, say, that she will be ejected from her home absent an injunction. She alleges that the lockout occurred over two years ago, on October 3, 2012. Only on the first night of the lockout, when Peterson reports she stayed the night in the hotel's lobby, does it appear that she was without accommodations. (Affidavit, ¶ 35) By the time of Peterson's October 19, 2012 hearing in state court, she had found another hotel in which to live. (*See* Hearing, 7) (state court judge remarking "you told me yesterday under oath that you have indeed lived in at least one if not two hotels since the alleged illegal lock out occurred back on October 3.").

Second, Peterson was not deprived of the means to obtain alternative housing. The defendants promptly refunded Peterson her $900 lodging fee for

10

October 2012. "As we established during yesterday's hearing on your [indigence] application the hotel refunded all monies that you gave them for your October residency and that was $900.00. So you have the means and the method by which to obtain alternative housing." (Hearing, 7) That money could be, and no doubt was, applied to defray her housing costs for October 2012. The defendant now lives in Georgia, presumably in housing of some kind.

Third, there is no showing or even any allegation that the premises were unique or irreplaceable. A hotel room in Northern New Jersey is not a rare commodity. If this $900 per month room became unavailable, presumably another $900 per month room would serve Peterson's needs just as well. If that $900 monthly cost was below the market rate—*i.e.*, if replacement premises cost more—then the difference between the two rates would be a basis for an award of damages, not an injunction.[5]

Fourth, a preliminary injunction installing Peterson in comparable housing would not be a proportionate remedy, because ESA was at all times entitled to terminate the contract on 30 days' notice. Any injunction would have to be founded on Peterson's rights under the contract. The LTL provided that either party could terminate the lodging agreement at any time by providing the other party 30 days' written notice. (See LTL, 3) At the latest, the defendants notified Plaintiff of their intent to terminate the agreement on September 14, 2012, when they posted a warrant of removal on Peterson's

---

[5]   Irreparable harm from a breach of contract is closely related to the standard for an award of specific performance. New Jersey courts have recognized two circumstances in which specific performance is an appropriate remedy for a past breach of contract: 1) "when money damages are not adequate to protect the expectation interest of the injured party"; *Houseman v. Dare*, 966 A.2d 24, 27 (App. Div. 2009); and 2) "when an agreement concerns possession of property such as heirlooms, family treasures and works of art that induce a strong sentimental attachment." *Id.* This sentiment is echoed in the Restatement (Second) of Contracts, which explains that specific performance is not appropriate where "damages would be adequate to protect the expectation of the injured party." RESTATEMENT (SECOND) OF CONTRACTS § 359 (1981) (cited with approval in *Houseman*, 966 A.2d at 27). A hotel room is not unique. And it is available for money.

door. (Compl., ¶ 11)[6] When she was allegedly evicted, on October 3, 2012, that 30 day period had 12 days left to run. But even making the most favorable assumption—that ESA *never* gave notice in writing—it could do so at any time. Even if plaintiff were restored to her old room, her stay could legitimately be limited to 30 days.[7] What is meaningfully at stake, then, is 30 days, or $900 worth, of housing. Monetary damages can adequately compensate the plaintiff for that, assuming she prevails.

That 30-day cancellation right, by the way, implies that injunctive relief at the end of litigation would be no less effective than injunctive relief now. Its effect, whether now or later, would be to place plaintiff in a room (for which she would have to pay) for a month. It would not preserve any status quo *pendente lite*.[8] And with such a short period of time at stake, I cannot see any particular advantage in ordering this 30-day relief now, as opposed to at the conclusion of the litigation. Plaintiff cannot demonstrate that she will suffer irreparable harm from the denial of preliminary, as opposed to final, injunctive relief.

Fifth, plaintiff does not allege that she has lost something valuable and irreplaceable—for example, housing she would be entitled to occupy without further payment. What she has lost is, at most, the right to occupy a room *and pay for it by the month.* Like anyone with the requisite funds, she continues to

---

[6] Although the LTL limited the forms of notice that would be effective under the contract, it appears that this form of notice is acceptable. *See* LTL, 3 ("Notice to a Lodger shall be deemed valid if...conspicuously posted to the front door of the [lodger's] Room.").

[7] To look at it another way, the contract would have expired by its own terms at the end of October 2012. The LTL was originally for a 90-day period, and it provided that it could be renewed for additional 90-day terms. (See LTL, 1) ("This Lodging Agreement may be renewed for additional 3 months (90) day periods."). The agreement began on February 18, 2009. If it were renewed in 90-day intervals after that, the last renewal period would have ended on October 30, 2012, at the latest. That means that ESA would have owed Peterson housing for, at most, the 27 days from October 3, 2012 through October 30, 2012.

[8] The opposite, in fact. If plaintiff receives a 30-day tenancy to which she is ultimately not entitled, there will be no way to retroactively reverse the award of preliminary relief.

possess that "right." And she may exercise that right at any one of a myriad of lodging facilities.

Sixth, plaintiff's miscellaneous claimed injuries are compensable in damages, and for the most part would not be assuaged by an immediate injunction. If a breach of contract caused Peterson to pay a higher rent, she might sue for the difference. If it caused her incidental expenses, such as relocation or storage of personal effects, that too may be compensated for in money. Peterson claims that she was previously diagnosed with Post Traumatic Stress Disorder, and that the defendants' actions cause her to "re-experience PTSD symptoms." (Dkt. No. 30, ¶ 52) Courts and juries, however, routinely assess damages for such suffering—and it is difficult to see how the requested injunction would head off emotional harm.[9]

Because Peterson discusses it at length, I consider the State case of *Crowe v. De Gioia*, 447 A.2d 173 (N.J. 1982). Crowe, the plaintiff, alleged that the defendant had agreed to support her for the rest of her life, but was in breach of that agreement. She alleged that without an injunction she would have nowhere to live and no means to support herself. 447 A.2d at 174-75, 177. It was in that context that the Court explained that "[n]either an unwarranted eviction nor reduction to poverty can be compensated adequately by monetary damages awarded after a distant plenary hearing." *Crowe*, 447 A.2d at 176-77. Peterson, by contrast, does not allege that she was entitled to housing free of charge, or that without an injunction she will be left without housing. *Crowe*, to the extent I would consider it as persuasive authority, remains highly distinguishable.

---

[9] Peterson argues generally that she can never be adequately compensated for the experience of being thrown out of her home, and therefore has suffered irreparable harm. (Mot., ¶¶ 30-31) I understand the sentiment; nevertheless, I think that plaintiff misconstrues the standard for issuing a preliminary injunction. The question I must consider is not whether Peterson was harmed, but whether irreparable harm will result if relief is not ordered right now.

13

Taking Peterson's allegations at face value, I conclude that she cannot make a showing of irreparable harm or demonstrate that a preliminary injunction placing her in comparable premises would be efficacious.

### b. Request to notify creditors

I next consider whether Peterson has shown that irreparable harm will result if I do not, as she requests, notify her creditors that ESA is responsible for her having fallen into debt. Peterson, however, has not plausibly alleged, let alone demonstrated, that the misfortunes she describes were caused by the defendants' alleged breach of contract. I decline to issue an injunction to remedy situations that do not appear to be causally connected to the wrongs of which she complains. As the Third Circuit has explained, "preliminary injunctions should not be granted when they deal with issues wholly outside the issues in the suit, and seek intermediate relief of a different character than the relief ultimately sought." *Jones v. Sec'y Pennsylvania Dep't of Corr.*, 589 F. App'x 591, 594 (3d Cir. 2014) (internal quotations omitted) (citing *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945)).

Peterson argues that her credit score has been "decimated," and that she is financially ruined. (Mot., ¶ 73; Compl., 3) But Peterson does not explain how the defendants caused such an outcome. She alleges that "because of [the defendants'] fraud, plaintiff was forced to prematurely begin withdrawal of plaintiff's Social Security annuity; as a result plaintiff is on a reduced fixed income. Because of defendants['] actions, plaintiff could not continue to pay bills and therefore plaintiff credit score, previously on average 780, was destroyed." There is no explanation in the complaint, however, as to how the defendants' alleged breach of their lodging contract caused Peterson such financial difficulties. The record before me indicates that ESA and Peterson had a contract for lodging at a rate of $900 per month, and that there was, at most, one month left on this contract. There simply are no facts alleged that would permit me to conclude that the defendants' alleged breach of contract had such far-reaching economic consequences. Alternatively, there is no demonstration

14

of how the continuation of the contract—with its obligation to pay $900 per month—would have staved off economic harm.

Peterson has not alleged that the defendants reported her alleged delinquency to any credit agency. She mentions that Verizon placed a negative notation on her credit report, but does not connect that to any act by any defendant in this case. (Affidavit, ¶ 64) She refers to two other events that negatively affected her credit report: a 2007 incident involving a landlord, and a 2004 incident involving a dispute over medical bills. (Affidavit, ¶ 65) Both long preceded the events for which she sues here.

Peterson seems to be arguing that the defendants' actions caused her to exceed her credit limit. (Affidavit, ¶ 77) Again, it is unclear how the denial of a room for October 2012 (for which her $900 was refunded in any event) could have had such an effect.

In short, these harms appear too remote from the allegedly actionable conduct of ESA to warrant a preliminary injunction.

I do not prejudge the merits of Peterson's claims. But because I have found that Peterson has not shown that irreparable harm will result in the absence of immediate relief, a preliminary injunction is not appropriate.

## **Conclusion**

There are no factual disputes requiring a hearing. Peterson's motion for a preliminary injunction will be denied. A separate order will issue.

June 11, 2015
Newark, New Jersey

_____
KEVIN MCNULTY
United States District Judge