## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ANDREA PETERSON,** | Civ. No. 14-1137 (KM) |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **HVM LLC, et al.,** | |
| **Defendants.** | |

### KEVIN MCNULTY, U.S.D.J.:

This dispute arises from the alleged breach of a long-term lodging agreement. The plaintiff, Andrea Peterson, alleges that she was wrongfully evicted from her hotel room, where she had been living for several years. Plaintiff brings this *pro se* action alleging numerous causes of action including breach of contract, intentional infliction of emotional distress, and violations of her civil rights. (*See* Dkt. No. 10 ("Cplt."))

Before this Court is defendants' motion to dismiss the complaint. (Dkt. No. 32) For the reasons set forth below, I will partially grant the motion to dismiss.

## I.   FACTUAL BACKGROUND

### The contract

In 2009, plaintiff Andrea Peterson entered into a Long-Term Lodging Agreement with HVM LLC ("HVM") to stay at the Extended Stay America ("ESA") hotel in Secaucus. (*See* Dkt. No. 10-1, Ex. A (the "Contract") p. 2.) HVM operates ESA hotels. (Cplt. p. 6) Under the agreement, ESA was to provide Peterson with lodging in exchange for $900 per month. (Cplt. ¶ 2) The contract stated that it would expire in "3 months (90 days)." (Contract p. 1) However, the agreement also provided that the parties could renew their contract "for

additional 3 months (90 day) periods." (*Id.*) The agreement did not specify any particular method for renewing the contract, and Peterson does not explicitly allege that the contract was ever renewed. However, she does allege that defendants breached the contract in October of 2012 and that she made the monthly $900 payment after May of 2009. (Cplt. p. 2, ¶¶ 5, 34.)) One is left to assume that the parties renewed the contract (or at least that Peterson alleges that they did) for subsequent 3-month periods between May of 2009 and October of 2012.

The contract also provided that either party could terminate the contract at any time by giving the other party 30 days' written notice. (Contract p. 3). The contract would be "deemed terminated at 11:00 a.m. on the thirtieth (30th) day following receipt of the notice." (*Id.*) The agreement required such notice to be made in writing, either by mail, personal service, or posted on the front door of the hotel Room. (Contract p. 4)[1] The agreement provided that if the lodger held the room after the expiration date, the hotel could "deny access to the Room to Lodger at any time during the Holdover Period." (*Id.*) In addition, the agreement explicitly disclaimed any landlord tenant relationship between the parties and stated that the relationship is one of "hotel manager and guest." (Contract pp. 2-3)

### The state court proceedings

In June 2012, ESA initiated state court proceedings to remove Peterson from her hotel room. (NJ case number LT-9118-12) Defendants contend that Peterson received a summons in this action on July 9, 2012. (*See* Dkt. No. 10-1, Ex. D.) Peterson disputes that she ever received the summons. (*See* Cplt. ¶¶ 14, 16; Dkt. No. 10-2 ¶¶ 6, 63). The summons listed Peterson's address as "One Meadowlands Parkway, Room 507" in Secaucus. (Dkt. No. 10-1, Ex. D) According to Peterson, though, she resided at "One Plaza Drive," Room 507 in

---

[1]        The contract gave the address of "1 Meadowland Pkwy" (no room number) in Secaucus as the address at which to provide notice. (Contract 4)

Secaucus. (Cplt. ¶ 13) On July 26, 2012, ESA obtained a warrant of removal from the New Jersey state court. (Cplt. ¶ 7)

ESA initiated a second suit and obtained another warrant of removal on September 10, 2012. (NJ case number LT-011864-12) (Cplt. ¶¶ 8-9) This warrant of removal listed Peterson's residence as "One Plaza Drive, Room 504" (not 507) in Secaucus. (Cplt. ¶ 8) On September 14, 2012, ESA posted the notice of removal on the door of Peterson's room (which was apparently the correct room, 507). (Cplt. ¶ 11) Sometime after that, it appears that a default judgment was entered against Peterson in this second case (No. LT-011864-12). (*See* Dkt. No. 10-1, Ex. F.)

While Peterson denies receiving notice in the first removal action, it appears that she did become aware of the second notice of removal when it was posted on her door. (Cplt. ¶ 11) She also recounts that on August 17, 2012, a letter was slid under her door with a return address of Superior Court of New Jersey, Law Division, Special Part. (Dkt. No. 10-1, Ex. C ¶¶ 1-2) For reasons that are not clear, Peterson did not open the letter. Instead, she asked the hotel manager to mark the envelope "return to sender" and return it to the post office. She stated that she does not accept mail at the hotel address; she accepts mail only at a post office box. (*Id.* ¶¶ 2-3)

In any case, on September 19, 2012, Peterson moved to dismiss both of ESA's state court suits against her. (Dkt. No. 10-1, Ex. C) On October 2, 2012, the state court, agreeing with Peterson, found that it lacked jurisdiction because the contract explicitly disclaimed any landlord tenant relationship between the parties. (Dkt. No. 10-1, Ex. F) The court vacated the two warrants of removal and dismissed case number LT-11864-12. ESA then withdrew its complaint in case number LT-9118-12. (*Id.*)

### The lockout

Peterson alleges that the next day, October 3, 2012, around 10:30 a.m., the hotel manager told Peterson that he was "putting [Peterson] out of the hotel." (Cplt. ¶ 23) That afternoon around 2:45 p.m., while she had left the

room to walk her dog, the hotel locked Peterson out of her room by disabling her key-card access. (Cplt. ¶ 25) When plaintiff requested an explanation from the manager, he stated that he was instructed by corporate to disable her access and that the hotel had "played games with [Peterson] for two (2) years." (*Id.*) According to Peterson, the hotel did not allow her to enter her room to eat, bathe, change clothes, or get food for her dog. (Cplt. ¶ 26) Plaintiff alleges that she and her dog were forced to sleep in the lobby of the hotel overnight. (Dkt. No. 10-2 ¶ 35) The next day, she was escorted to her room by the police and allowed to gather a few personal items. (Dkt. No. 10-2 ¶ 36)

### Subsequent litigation

Peterson filed suit in New Jersey state court, requesting a temporary restraining order and a preliminary injunction requiring the hotel to provide her with lodging. (Cplt. ¶ 30) Her request for injunctive relief was denied. (Dkt. No. 10-2 ¶ 120)

On October 16, 2013, Peterson filed this complaint in the U.S. District Court for the Northern District of Georgia, where she had taken up residence. (*See id.* p. 3) Venue was later transferred to this District. (*Id.* p. 6-8, 9)

The complaint names as defendants HVM and ESA. (Cplt. p. 1) It also names Centerbridge Partners LP ("Centerbridge"), Paulson & Company ("Paulson"), and Blackstone Real Estate Partners VI ("Blackstone"), investment entities which allegedly own an interest in ESA (Cplt. p. 6).

The complaint asserts a number of claims arising out of Peterson's eviction, including breach of contract, intentional infliction of emotional distress, and fraud. Peterson also argues that the proceedings in state court violated her constitutional rights. The complaint requests damages stemming from the eviction, for litigation costs, and for pain and suffering.[2] (Cplt. ¶¶ 27-28) Plaintiff alleges that "[d]efendants actions caused [her] financial ruin,"

---

[2]    Peterson also previously requested injunctive relief from this Court, which was denied. (*See* Dkt. Nos. 3, 30, 43).

destroyed her credit, caused her personal items to be sold at auction, and "caused plaintiff extreme emotional pain, devastation." (Cplt. p. 3)

Defendants move to dismiss the complaint under FED. R. CIV. P. 12(b)(2) and (b)(6). Defendants argue that personal jurisdiction does not exist over Centerbridge, Paulson, and Blackstone (together, the "investors"). In addition, defendants argue that plaintiff has failed to sufficiently allege her intended causes of action, warranting dismissal under Rule 12(b)(6).

## II.   ANALYSIS
### A. Claims against Investors

In addition to ESA and HVM, Peterson brings suit against three entities that invested in ESA—Centerbridge, Paulson, and Blackstone. Defendants argue that the plaintiff has not established personal jurisdiction over the investors, and that therefore, they should be dismissed from the case. I agree and will dismiss the claims against the investors.[3]

#### a. Personal Jurisdiction

Once a defendant files a motion to dismiss for lack of personal jurisdiction pursuant to FED. R. CIV. P. 12(b)(2), the plaintiff bears the burden of establishing sufficient facts to show that jurisdiction exists. *Marten v. Godwin,* 499 F.3d 290, 295–96 (3d Cir. 2007). Initially, a court must accept the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff, *Pinker v. Roche Holdings, Ltd.,* 292 F.3d 361, 368 (3d Cir. 2002), but the court must still examine any evidence presented with regard to disputed factual allegations. *See, e.g., Eurofins Pharma U.S. Holdings v. BioAlliance Pharma SA,* 623 F.3d 147, 155–56 (3d Cir. 2010) (examining the evidence supporting the plaintiffs allegations); *Patterson v. FBI,* 893 F.2d 595, 603–04 (3d Cir. 1990) ("A Rule 12(b)(2) motion, such as the motion made by the defendants here, is inherently a matter which requires resolution of factual

---

[3]   Because I dismiss the investors for lack of personal jurisdiction, I do not address the other grounds for dismissal that they assert. (*See* Dkt. No. 32 pp. 7-8.)

issues outside the pleadings, i.e. whether in personam jurisdiction actually lies. Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence.' ") (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.,* 735 F.2d 61, 66 n.9 (3d Cir. 1984)).

The plaintiff "need only establish a prima facie case of personal jurisdiction." *Miller Yacht Sales, Inc. v. Smith,* 384 F.3d 93, 97 (3d Cir. 2004). However, a plaintiff may not "rely on the bare pleadings alone" in order to withstand a motion to dismiss for lack of personal jurisdiction; "[o]nce the motion is made, plaintiff must respond with actual proofs, not mere allegations." *Patterson,* 893 F.2d at 604 (internal citations omitted); *Time Share Vacation Club,* 735 F.2d at 66 n.9.

To assess whether it has personal jurisdiction over a defendant, a district court must undertake a two-step inquiry. *IMO Indus., Inc. v. Kiekert, AG,* 155 F.3d 254, 259 (3d Cir. 1998). First, the court is required to use the relevant state's long-arm statute to see whether it permits the exercise of personal jurisdiction. *Id.;* FED. R .CIV. P. 4(k). "Second, the court must apply the principles of due process" under the federal Constitution. *WorldScape, Inc. v. Sails Capital Mgmt.,* Civ. No. 10–4207, 2011 WL 3444218 (D.N.J. Aug. 5, 2011) (citing *IMO Indus.,* 155 F.3d at 259).

In New Jersey, the first step collapses into the second because "New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution." *Miller Yacht Sales,* 384 F.3d at 96 (citing N.J. Ct. R. 4:4-4(c)). Accordingly, personal jurisdiction over a non-resident defendant is proper in this Court if the defendant has "'certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n,* 819 F.2d 434, 437 (3d Cir. 1987) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S. Ct. 154, 90 L.Ed. 95 (1945)).

There are two kinds of personal jurisdiction that allow a district court to hear a case involving a non-resident defendant: general and specific. A court may exercise general jurisdiction over a foreign corporation where "the defendant's contacts with the forum are so 'continuous and systematic' as to render them essentially 'at home' in the forum state." *Senju Pharmaceutical Co., Ltd. v. Metrics, Inc.,* 96 F.Supp.3d 428, 435 (D.N.J. 2015) (citing *Daimler AG v. Bauman,* — U.S. —, 134 S.Ct. 746, 754, 187 L.Ed.2d 624 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown,* — U.S. —, 131 S. Ct. 2846, 2851, 180 L.Ed.2d 796 (2011); *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).

In contrast to general jurisdiction, specific jurisdiction relies on the defendant's forum-related activities that give rise to the plaintiffs' claims. *See Helicopteros,* 466 U.S. at 414 n.8, 104 S.Ct. 1872. Establishing specific jurisdiction requires a three-part inquiry: (1) whether the defendant purposefully directed its activities at the forum; (2) whether the litigation arises out of or relates to at least one of the contacts; and (3) whether the exercise of jurisdiction otherwise comports with traditional notions of fair play and substantial justice. *O'Connor v. Sandy Lane Hotel Co., Ltd.,* 496 F.3d 312, 317 (3d Cir. 2007). The defendant need not be physically located in the state while committing the alleged acts. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Nor is specific jurisdiction defeated merely because the bulk of harm occurred outside the forum. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 780, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). A single act may satisfy the minimum contacts test if it creates a substantial connection with the forum. *Burger King,* 471 U.S. at 476 n. 18, 105 S.Ct. 2174.

## b. Personal Jurisdiction over the Investors

Peterson alleges that ESA is "owned by three investment firms," Blackstone, Centerbridge, and Paulson. (Cplt. p. 7) More specifically, the complaint states that in 2010, "[a]n investment group [led] by" the investors

7

"purchased ESA for $3.9 billion." (*Id.* p. 6) The complaint states that Centerbridge is a private equity firm incorporated in Delaware, with its principal place of business in New York. (*Id.*) It also alleges that Paulson is a "hedge fund sponsor," incorporated in Delaware with its principal place of business in New York. (*Id.* p. 8) Likewise, the complaint alleges that Blackstone is a private equity fund incorporated in Delaware with its principal place of business in New York. (*Id.*) Plaintiff also lists "registered agent[s]" for the investors, none of which are located in New Jersey. (*Id.* pp. 8-9) Other than these basic descriptors, the complaint is devoid of allegations relating to the investors. These allegations are insufficient to establish general or specific jurisdiction over the investors.

As to general jurisdiction, Ms. Peterson has not alleged any facts demonstrating that the investors had "continuous and systematic" contact that would render them "at home" in New Jersey. *Senju,* 96 F. Supp. 3d at 435. In fact, she has not alleged that the investors had *any* contact with New Jersey whatsoever. According to the complaint, the three investors are all incorporated in Delaware and have their principal place of business in New York. (Cplt. pp. 7-8)

Plaintiff appears to rely solely on the investors' ownership interest in ESA to support jurisdiction. However, the "[a] foreign corporation is not subject to the jurisdiction of the forum state merely because of its ownership of the shares of stock of a subsidiary doing business in that state." *Streamline Business Services, LLC v. Vidible, Inc.,* Civ. No. 14-1433, 2014 WL 4209550, at *7 (E.D. Pa. Aug. 26, 2014) (out-of-state venture capital firms were not subject to general jurisdiction based on investment in entity operating in forum-state) (quoting *Lucas v. Gulf & Western Indus., Inc.,* 666 F.2d 800, 805-06 (3d Cir. 1981) (internal quotations omitted). Indeed, "[i]n all but the most 'exceptional case'" a corporation is subject to general jurisdiction "in only two places: its place of incorporation and its principal place of business." *Senju,* 96 F.Supp.3d at 441 (quoting *Daimler,* 134 S.Ct. at 760-61).

Similarly, plaintiff has not established specific jurisdiction over the investors. Again, the only allegations of any kind that relate to the investors are that they owned an interest in ESA. The plaintiff has not presented any forum-related activities of the investors that gave rise to the claims at hand. *See Helicopteros,* 466 U.S. at 414 n.8. There are no allegations that the investors were involved in the negotiation or execution of the contract at issue in this case, or that they played a role in Ms. Peterson's subsequent eviction—let alone that they did so through activities connected with New Jersey.

Those circumstances suggest, too, that the complaint fails to plead a cause of action against the investors. Because jurisdiction is lacking, I do not reach those substantive grounds. [4]

In sum, I find that plaintiff has not met her burden of establishing that this Court has personal jurisdiction over the investors, *i.e.*, Centerbridge, Paulson, and Blackstone. I will dismiss the complaint as against those three defendants.

## B. Claims against the Remaining Defendants—HVM and ESA

Plaintiff's allegations are not broken into separate counts, but I have liberally construed her *pro se* complaint to allege the following causes of action: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) fraud pursuant to (i) common law and (ii) the New Jersey Consumer Fraud Act ("CFA"), (4) intentional infliction of emotional distress, (5) malicious prosecution or abuse of process, (6) defamation and false light, (7) violation of 42 U.S.C. § 1983 ("Section 1983"), and (8) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). [5] "Defendants," as used in the

---

[4]     In her opposition brief, plaintiff argues that the investors should be liable under the doctrine of respondeat superior. (*See* Dkt. No. 46 pp. 5-6.) As plaintiff notes, the doctrine of respondeat superior holds an employer vicariously liable for the conduct of its employee, where the employee was acting within the scope of employment. *Lylo v. Smith*, Civ. No. 05-2670, 2006 WL 2990468, at *3 (D.N.J. Oct. 19, 2006). As discussed *supra*, plaintiff's allegations regarding the investors are limited, and they do not support a vicarious liability claim.

[5]     Plaintiff states in her complaint that she alleges "violation of, States and

remainder of this opinion, refers to the remaining defendants, HVM and ESA.

### a. Rule 12(b)(6) Standard

FED. R. CIV. P. 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss, a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) ("reasonable inferences" principle not undermined by later Supreme Court *Twombly* case, *infra*).

FED. R. CIV. P. 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and formulaic recitation of the elements of a cause of action will not do.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a

---

Constitutional Rights, e.g., 42 U.S.C. § 1983, The Privileges and Immunities Clause of Article IV, Section 2 of the Constitution, Due process rights ... under the Fifth Amendment, and Fourteenth Amendment, Equal Protection" as well as "violations of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq, Breach of Contract, Fraud and Deceit, Defamation, Violation of the Covenant of Good Faith and Fair Dealings, Abuse of Process, Proximate Cause, False Light and Intentional Infliction of Emotional Distress." (Cplt. p. 3) In her request for relief, plaintiff also requests "[d]amages pursuant to RICO statute." *Id.* p. 28.

'probability requirement' ... it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678 (2009).

Where, as here, the plaintiff is proceeding *pro se*, the complaint is "to be liberally construed," and, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007). Nevertheless, it must meet some minimal standard. "While a litigant's pro se status requires a court to construe the allegations in the complaint liberally, a litigant is not absolved from complying with *Twombly* and the federal pleading requirements merely because s/he proceeds pro se." *Thakar v. Tan*, 372 Fed. App'x 325, 328 (3d Cir. 2010) (citation omitted).

### b. Litigation Privilege

Defendants contend that New Jersey's litigation privilege bars a number of the plaintiff's claims. Because the issue will recur as I discuss the individual claims, I briefly lay out the basic principles here.

The litigation privilege "ensures that [s]tatements by attorneys, parties and their representatives made in the course of judicial or quasi-judicial proceedings are absolutely privileged and immune from liability." *Giles v. Phelan, Hallinan & Schmieg, L.L.P.*, 901 F. Supp. 2d 509, 523 (D.N.J. 2012) (internal quotations and citations omitted). The privilege is "expansive" and "well-established" in New Jersey. *Id.* New Jersey courts have extended the privilege even to statements made by attorneys outside the courtroom—for example, during interviews and settlement conferences. *Id.* (citation omitted).

The New Jersey litigation privilege has four elements. It applies to "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Id.* (internal quotations and citations omitted). Traditionally applied to defamation claims, the privilege has been expanded to protect against "a host of other tort-related claims." *Id.* (internal quotations and citations omitted). As

11

the New Jersey Supreme Court has explained, if the privilege "is really to mean anything then we must not permit its circumvention by affording an almost equally unrestricted action under a different label [than defamation]." *Id.* at 523-24 (internal quotations and citations omitted).

Accordingly, New Jersey courts have applied the litigation privilege to a plethora of tort claims, including intentional and negligent infliction of emotional distress, material and negligent misrepresentation, fraud, interference with prospective economic advantage, breach of confidentiality, abuse of process, invasion of privacy, and civil conspiracy. *Id.* at 524 (internal citations omitted). Absent explicit abrogation by statute, the privilege is meant to be "broadly applicable." *Id.*

When the New Jersey courts say "broadly," they mean it:

> The litigation privilege is not limited to statements made in a courtroom during a trial; "it extends to all statements or communications in connection with the judicial proceeding." .... For example, the privilege covers statements made during settlement negotiations.... The privilege also protects a person while engaged in a private conference with an attorney regarding litigation.... Such application of the privilege affords litigants and witnesses "the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." ....

*Hawkins v. Harris,* 141 N.J. 207, 216, 661 A.2d 284, 289 (1995) (citations omitted). Thus the privilege extends to a broad range of litigation-related activities, as well as to a broad range of causes of action.

### c. Breach of Contract

To establish a breach of contract claim under New Jersey law, a plaintiff must allege "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007) (internal citation omitted). Giving Ms. Peterson the benefit of every factual inference, she has put forth allegations sufficient to survive a motion to dismiss on her breach of contract claim.

Peterson has alleged that she entered into a contract with HVM for lodging at ESA in Secaucus, and defendants do not appear to contest this. *See* Cplt. p. 1 (alleging a "Long Term Lodging Agreement with defendants"). The contract states that "either party may terminate this Agreement upon thirty (30) days' written notice to the other party." (Contract p. 3) Peterson alleges that the defendants breached this contract when they evicted her on October 3, 2012, without providing 30 days' written notice. (*See* Cplt. p. 2; ¶¶ 23-25.) Defendants do not dispute that they evicted plaintiff, but they contend that she had more than 30 days' written notice that they wanted her to leave. (Dkt. No. 32 p. 3)

As to notice, defendants point to the summons in the first landlord tenant action. (*See* Dkt. No. 10-1, Ex. D.) That summons, which stated, "The purpose of the attached complaint is to permanently remove you and your belongings from the premises," is dated well over 30 days before the eviction. *Id.* The summons indicates that it was served on Ms. Peterson on July 9, 2012, though details of the method of service are lacking.[6] Ms. Peterson, however,

---

[6]     The notes regarding service state only "hotel room" and "knock" (perhaps indicating that the process server knocked on the door and left the summons). Ms. Peterson alleges that when she found out about this court action (on her own initiative), she inquired for more details about the method of service but was told the court had no other information. (Dkt. No. 10-1, Ex. C ¶ 6) Relatedly, plaintiff alleges that the summons had the wrong address on it. It lists her address as "One Meadowlands Parkway," and she contends that she was instead living at "One Plaza Drive." (Cplt. ¶¶ 12-13) I need not resolve this factual issue to decide the motion to dismiss, but I note that the address listed on the contract is "One Meadowlands

repeatedly alleges that she did not receive any summons on July 9, 2012, nor did she receive any other written notice from defendants earlier than 30 days before they evicted her.[7] (*See* Cplt. ¶¶ 14, 16; Dkt. No. 10-2 ¶¶ 6 ("I was never served summons"), 63 ("I have never been served the documents ... Who certified that I was served?"); Dkt. No. 10-1, Ex. C ¶¶ 6-8). [8] Thus, accepting Ms. Peterson's allegations as true, which I must at this stage of the litigation, I find that she has sufficiently alleged that she was evicted without 30 days' written notice, in violation of the contract.[9]

Peterson has also alleged damages flowing from the alleged breach. (*See* Cplt. p. 3 ("Defendants actions caused plaintiff financial ruin, impoverished plaintiff, destroyed plaintiff credit, caused all plaintiff stored possessions to be sold at auction, caused plaintiff extreme emotional pain, devastation."); p. 27 (requesting replacement costs of household goods sold at auction and other damages)).

Finally, plaintiff has alleged that she fully performed under the contract. (*See* Cplt. p. 1. ("[P]laintiff was in full compliance with all the terms of plaintiff Contract. Plaintiff paid and defendants accepted plaintiff payments."); *see also* Cplt. ¶ 34 (alleging that plaintiff paid defendants $900 per month)).

---

Parkway." (*See* Contract p. 2.)

[7]     Plaintiff does acknowledge that she received a warrant of removal relating to a second landlord tenant action attached to her door on September 14, 2012 (less than 30 days before her eviction). (*See* Cplt. ¶ 11; Dkt. No 10-1, Ex. C ¶ 1.) Again, Peterson contends that the address on the warrant of removal was incorrect (it listed apartment 504 instead of 507).

[8]     The unopened August letter presents issues of fact that cannot be resolved on the pleadings, and defendants do not seem to rely on it for present purposes.

[9]     In their reply brief, defendants appear to argue an alternative theory of Ms. Peterson's eviction. They argue that Peterson was a holdover tenant as of May 18, 2009 and could be evicted at any time. (Dkt. No. 48 p. 7) However, as noted *supra* p. 2, a liberal reading of Ms. Peterson's complaint implies an allegation that the contract was renewed between May 2009 and October 2012. In fact, Ms. Peterson alleges that she made monthly $900 payments to defendants for at least a period of time beyond May of 2009. (*See* Cplt. ¶¶ 5, 34.) Therefore, even if I were to consider defendants' "holdover theory," plaintiff's allegations are sufficient to survive a motion to dismiss.

While these factual allegations remain untested, they are sufficient to meet plaintiff's burden at the motion to dismiss stage.

## C. Breach of the Covenant of Good Faith and Fair Dealing

Relatedly, the complaint alleges that defendants breached the implied covenant of good faith and fair dealing.

A covenant of good faith and fair dealing is implied in every contract in New Jersey. *See Sons of Thunder, Inc. v. Borden, Inc.,* 690 A.2d 575, 587 (N.J. 1997). A party may breach that implied covenant even when its actions do not violate a pertinent express term. *Id.* New Jersey has recognized an independent cause of action for breach of the implied covenant in three situations: "(1) to allow the inclusion of additional terms and conditions not expressly set forth in the contract, but consistent with the parties' contractual expectations; (2) to allow redress for a contracting party's bad-faith performance of an agreement, when it is a pretext for the exercise of a contractual right to terminate, even where the defendant has not breached any express term; and (3) to rectify a party's unfair exercise of discretion regarding its contract performance." *Berlin Med. Assocs., P.A. v. CMI N.J. Operating Corp.,* 2006 WL 2162435, at *9 (N.J. Super. Ct. App. Div. Aug. 3, 2006)(affirming dismissal of good faith and fair dealing claim as redundant of breach of contract claim where no facts suggested a pretext). A cause of action may lie where "the other party has acted consistent with the contract's literal terms, but has done so in such a manner so as to have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Wade v. Kessler Inst.,* 798 A.2d 1251, 1262 (N.J. 2002) (internal quotations and citation omitted). "[P]roof of bad motive or intention is vital to an action for breach of the covenant." *Westmont Dev. Grp., LLC v. Twp. of Haddon,* 625 F. Supp. 2d 178, 195 (D.N.J. 2009) (citing *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.,* 864 A.2d 387, 396 (N.J. 2005)).

Because Ms. Peterson does not separate her allegations into discrete counts, it is not clear which facts she relies on to support this claim. However,

the complaint could be read to allege that defendants' characterization of her eviction, as pursuant to their contract, is pretext for a spur-of-the-moment retaliatory eviction that deprived her of the benefit of their bargain.

For example, plaintiff alleges that on October 3, defendants "locked plaintiff out (evicted) plaintiff in retaliation for the October 2, 2013 Superior Court of Hudson County New Jersey Order that Granted [her] Motion for Order to Show Cause, and Vacated and Dismissed the fraudulent judgments and Warrants of Removal defendants had obtained." (Cplt. p. 2) Thus, her complaint could be read to say that regardless of whether she had notice (as of July 9, 2012 or some other date), defendants chose not to evict her until October 3, immediately following her success in state court. In other words, plaintiff would say that she was deprived of the benefit of the 30-day notice period called for by the contract (during which, I assume she would have looked for alternative housing) because her eviction came suddenly and was motivated by bad intent.[10]

Plaintiff's allegations also reflect animus toward her on the part of defendants, which supports an argument of pretext. (*See* Cplt. ¶ 25 (alleging that, after locking her out of her room, the hotel manager said to Ms. Peterson, "we have played games with you for two (2) years"; Dkt. No. 10-2 ¶ 35 (alleging that she was forced to sleep in the hotel lobby overnight)).

To be certain, these allegations are underdeveloped, and even under my liberal construction, they are thin. They may also be superfluous in that they add little to the breach of contract claim. Nevertheless, giving plaintiff the benefit of all factual inferences, I think they are sufficient to allow the claim to go forward so that it can be explored in conjunction with the breach of contract claim.

---

[10]    I assume that defendants' response to this argument would be that if/when Ms. Peterson became a holdover tenant, she could be evicted at any time. (*See* Dkt. No. 48 p. 7) I do not resolve such factual issues on this motion to dismiss but note generally that whether plaintiff was evicted in accordance with the contract depends on if and when Peterson received notice of her eviction, as well as interpretation of the contract, including the termination and holdover provisions.

## D. Fraud

A complaint alleging fraud, in addition to meeting the usual requirements of Rule 8(a) (*see* pp. 5-6, *supra*), must satisfy the heightened pleading requirements of FED. R. CIV. P. 9(b). A fraud complaint must "state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). That heightened Rule 9(b) pleading standard requires the plaintiff to "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico*, 507 F.3d at 200 (internal quotations and citation omitted). At a minimum, the plaintiff must provide one of two things: either

(1) "all of the essential factual background that would accompany 'the first paragraph of any newspaper story' - that is, the 'who, what, when, where and how' of the events at issue," *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276 (3d Cir. 2006) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997)); or

(2) some "alternative means of injecting precision and some measure of substantiation into their allegations of fraud," *Seville Indus. Machinery v. Southmost Machinery*, 742 F.2d 786, 791 (3d Cir. 1984).

The purpose of Rule 9(b) is to "provide notice of the 'precise misconduct' with which defendants are charged and to prevent false or unsubstantiated charges." *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998) (internal citations omitted). It is in the nature of some frauds, however, that their details may remain concealed even at the time the complaint is filed. Courts should therefore "apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Id.*

Plaintiff's specific allegations of fraud are limited. She states in general terms that her damages are "[b]ecause of fraud." (Cplt. ¶ 46) Ms. Peterson also alleges that defendants "fraudulently" represented to the landlord tenant court

17

that she was in arrears, resulting in "fraudulent judgments and Warrants of removal." (Cplt. p. 4, 2) Liberally construing her complaint, she appears to allege common law fraud ("fraud and deceit" (Cplt. p. 3)), and she explicitly cites the CFA (Cplt. pp. 3, 28).

### 1. Common Law Fraud

To state a claim for common law fraud in New Jersey, a plaintiff must allege five elements: "(1) a material misrepresentation of fact; (2) knowledge or belief by the defendant of its falsity; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damage." *Frederico*, 507 F.3d at 200 (internal citations and quotations omitted). Rule 9(b) requires that a complaint do more than convey the general impression that a fraud may have occurred. It requires that "the circumstances surrounding the fraud be stated with particularity." *Id.*

Here, I need not address the merits of plaintiff's fraud claim because it runs afoul of the litigation privilege. (*See* section II.B.b, *supra.*) New Jersey courts have applied the expansive litigation privilege to claims of fraud. *See Grange Consulting Group v. Bergstein*, 2014 WL 5308188, No. 13-6768, at *2 (D.N.J. Oct. 16, 2014)(citing the New Jersey Supreme Court's statement in *Loigman v. Twp. Comm. of Twp. of Middletown*, 185 N.J. 566, 889 A.2d 426, 436 (2006), that the litigation privilege has been applied to claims of fraud); *Giles*, 901 F.Supp.2d at 524 (same). Here, Ms. Peterson's fraud claim meets all of the criteria necessary to apply the privilege. The statements on which Ms. Peterson bases her fraud claim were (1) made in judicial proceedings, (2) by litigants and their counsel, (3) in order to achieve the objective of the litigation, and (4) were undoubtedly related to the ligation. Such a claim falls squarely within the litigation privilege. The corrective to false or misleading statements in state court lies in the litigation process itself.

Accordingly, I will apply the privilege and dismiss plaintiff's common law fraud claim with prejudice.[11] *See Giles*, 901 F.Supp.2d at 533 (dismissing claim

_____

11      In certain extreme cases, courts have declined to extend the litigation privilege

18

barred by the litigation privilege with prejudice).

## 2. New Jersey Consumer Fraud Act

The New Jersey Consumer Fraud Act prohibits fraud by businesses dealing with consumers. N.J.S.A. § 56:8-1 *et seq.* "[T]o state a CFA claim, a plaintiff must allege three elements: (1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss." *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076, 1086 (N.J. 2007) (internal citations and quotations omitted).

Ms. Peterson's complaint contains a conclusory statement that "Defendants violated the New Jersey Fraud Act," without additional specifics. (Cplt. ¶ 36) Therefore, I can only conclude that plaintiff relies on the allegations throughout her complaint that defendants made false representations about her to the state courts. This is far from the core concern of the NJCFA, which is not litigation, but deceptive or unconscionable practices in connection with consumer transactions.

Again, however, I will not reach the merits of such a CFA claim because it is barred by the litigation privilege. *See Giles*, 901 F. Supp. 2d at 524 (the litigation privilege applies to NJCFA claims because the privilege is "generally

---

to claims of fraud. For example, in *Williams v. BASF Catalysts LLC*, the Third Circuit declined to apply the privilege where a law firm "actively frustrated the search for truth and purposefully misled their adversaries," in an asbestos class action litigation, including by submitting false sworn statements from employees and experts. 765 F.3d 306, 318-19 (3d Cir. 2014). The misconduct occurred "in and out of courtrooms from Ohio to Pennsylvania to New York," and the court noted that therefore, "[n]o single court had the perspective or authority to mitigate the fraud or the ability to detect it." *Id.* at 318. In addition, the alleged fraud "outlasted the careers of many of the perpetrators," eliminating the deterrent value of professional sanctions or other discipline for such conduct. *Id.* at 319. These are not the circumstances here, which are closer to cases where courts have applied the litigation privilege to claims based on misrepresentations made to a court. *See e.g., Thompson v. Eva's Village and Sheltering Program*, Civ. No. 09-1510, 2009 WL 3486050, at *9 (D.N.J. Oct. 28, 2009)(applying the litigation privilege to claim of "fraud upon the court" based on verbal and written statements made by attorneys in judicial proceedings); *Giles,* 901 F.Supp.2d at 525-26 (declining to find an exception to the litigation privilege for allegations of fraud on the court).

so broad" and because the statute does not abrogate the privilege) (citation omitted). Ms. Peterson's allegations rest on the same statements discussed *supra*, which defendants made during and in furtherance of the state court proceedings. These allegations, too, warrant the application of the litigation privilege. Accordingly, Ms. Peterson's CFA claim is dismissed with prejudice.

### E. Malicious Prosecution/Abuse of process

Though the complaint does not explicitly include a claim of malicious prosecution, the allegations suggest such a cause of action. Under New Jersey law, malicious prosecution occurs in a civil action where "the [suit] was brought without probable cause ... actuated by malice ... plaintiffs *suffered a special grievance*, and ... the proceeding has been terminated favorably to the plaintiff." *Venuto v. Carlla, Byrne, Bain, Gilfillan, Ceccie & Stewart, P.C.*, 11 F.3d 385, 388-89 (3d Cir. 1993) (emphasis in original) (citations omitted).[12] Ms. Peterson's allegations that defendants intentionally lied about her to the state courts in an effort to evict her, would seem a natural fit for such a claim.

A claim of abuse of process alleges "the misuse or misapplication of the legal procedure in a manner not contemplated by law." *Simone v. Golden Nugget Hotel and Casino*, 844 F.2d 1031, 1036 (3d Cir. 1988). Ms. Peterson includes a claim of "abuse of process" among a string of other claims in the introductory section of her complaint. (*See* Cplt. p. 2) The claim is not otherwise elaborated on, and I am left to assume that she relies on the same allegations, described *supra*, that the defendants filed eviction actions falsely accusing her of non-payment. (*See, e.g.*, Cplt. pp. 2, 4.)

---

[12] A special grievance consists of "the *interference with a party's personal liberty or property*," including "wrongful interference with possession or enjoyment of property." *Id.* at 389 (emphasis in original). At this stage, I express no view as to whether plaintiff has suffered a special grievance sufficient to establish this element of the claim. Nor do I resolve whether plaintiff has established the other elements of the tort, including whether the state court removal actions were "terminated favorably to the plaintiff" (now, defendants). I note that warrants of removal were at one point issued in then-plaintiffs' favor, but later vacated. These allegations, like all others, are subject to proof.

The litigation privilege does not apply to claims of malicious prosecution. *See Giles*, 901 F. Supp. 2d at 524 ("[U]nder New Jersey law … the only state law claim from which defendants expressly cannot seek protection through the litigation privilege is malicious prosecution.") (citing *Loigman*). In contrast, it has been said that the privilege has been applied to abuse of process. *See Grange*, 2014 WL 5308188, at *2 (noting that abuse of process is among "[t]he spectrum" of legal theories to which the litigation privilege has been applied in New Jersey) (citing *Loigman*).

True, these tort claims, as they develop factually, might turn out to be barred by the privilege. Nevertheless, at the pleading stage, I am cautious about applying the privilege to bar torts which, by their very nature, relate to court proceedings. To hold the privilege *generically* applicable would, in effect, negate these torts; that is too much weight for the privilege to bear.

The motion to dismiss will therefore be denied as to malicious prosecution/abuse of process.

## F. Intentional Infliction of Emotional Distress

In order to establish a claim of intentional infliction of emotional distress ("IIED"), the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe. *Buckley v. Trenton Saving Fund Soc.*, 111 N.J. 355, 366–67, 544 A.2d 857, 863 (1988). The defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* In addition, plaintiff's distress must be "so severe that no reasonable man could be expected to endure it." *Id.*

Ms. Peterson's complaint lists IIED as one of her alleged causes of action, but the specific allegations she relies on to support the claim are unclear. I am again left to assume that Ms. Peterson is relying, at least in part, on her contention that defendants falsely brought removal proceedings against her. For the reasons discussed *supra*, Ms. Peterson's claim of IIED is barred by the

litigation privilege to the extent it may rest on statements defendants made in the state court actions. *See Grange*, 2014 WL 5308188, at *2 (litigation privilege has been applied to bar claims of intentional infliction of emotional distress).

In addition, however, Ms. Peterson's complaint relates the tortious impact of her eviction from her hotel room on October 3, 2010. For example, Ms. Peterson alleges that she was locked out of her room when walking her dog, that defendants refused her re-entry to get a change of clothes or other personal items until a police escort arrived, and that she and her dog spent the night in the lobby of the hotel. (Cplt. ¶¶ 25, 29; Dkt. No. 10-2 ¶ 35)

Conduct in connection with eviction may rise to the level of IIED in an extreme case. *See Williams v. Guzzardi*, 875 F.2d 46, 52 (3d Cir. 1989) (Pennsylvania law). Such a claim may be barred, wholly or in part, by the economic loss doctrine. The economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995). *See Espaillat v. Deutsche Bank Nat. Trust Co.*, Civ. No. 15-0314, 2015 WL 2412153, at *4 (D.N.J. May 21, 2015)(dismissing intentional infliction of emotional distress claim that was "rooted in a contractual relationship between the parties"). The extent to which the defendants' alleged mistreatment of the plaintiff can be separated from matters of contract, however, must be explored in discovery. I will give the benefit of the doubt to this *pro se* complaint on that score and permit it to go forward.

The motion to dismiss the IIED claim is denied.

## G. Defamation and False Light

In order to state a claim for defamation under New Jersey law, "a plaintiff must show that the defendant (1) made a false and defamatory statement concerning the plaintiff, (2) communicated the statement to a third party, and (3) had a sufficient degree of fault." *Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 204 (D.N.J. 2011) (citation omitted). False light is similar in that

it involves a statement that places someone "before the public in a false light." *Cibenko v. Worth Publishers, Inc.*, 510 F.Supp. 761, 766 (D.N.J. 1981). The tort of false light allows a plaintiff to recover for the invasion of his privacy if "(1) the false light in which the other was placed would be highly offensive to a reasonable person," and (2) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 589, 969 A.2d 1097 (2009).

In supporting her claims of defamation and false light, Ms. Peterson alleges that "Defendants under oath, knowingly communicated false and defamatory statements of fact about plaintiff to the Superior Court of Hudson County Landlord Tenant Court, that defendant had actual knowledge was false, obtained Warrants of Removal and posted on the door of the unit that plaintiff occupied, evicted plaintiff, and placed plaintiff in a false light." (Cplt. pp. 2, 4; Dkt. No. 10-2 ¶ 14)

Such statements lie at the heart of the litigation privilege. Every day, courts make factual findings that one party has spoken truly, and the other not. Were it not for the litigation privilege, perhaps every civil credibility finding would potentially give rise to an independent tort claim. The privilege exists to give factual contentions in court some breathing space and permit them to be explored in a controlled environment. That is why the privilege applies here. *See Grange*, 2014 WL 5308188, at *2 (litigation privilege applies to defamation actions); *Only v. Ascent Media Group, LLC*, Civ. No. 06-2123, 2006 WL 2865492, at *7 (D.N.J. Oct. 5, 2006)(litigation privilege applies to false light actions).

Plaintiff alleges that statements defendants made in the state court proceedings were false. As a result of these false representations to the court, plaintiff alleges that a warrant of removal was issued, and was placed on her door as a defamatory statement for third parties to see.[13] At the heart of the

---

[13]    True, placing the warrant of removal on plaintiff's door (which plaintiff takes

23

allegations are the statements defendants made to the state courts in the course of litigation, which are protected by the litigation privilege (and the warrant itself, which I suppose to be a "statement" of the state court). Accordingly, I find that the defamation and false light claims should be dismissed with prejudice.

### H. RICO

Pursuant to 18 U.S.C. § 1964(c), the federal RICO statute provides for recovery by any person injured in her business or property by reason of a violation of section 1962.[14] In order to state a claim under 1964(c), a plaintiff must plead "(1) a section 1962 violation and (2) an injury to business or property by reason of such injury." *Lightning Lube, Inc., v. Witco Corp.*, 4 F.3d 1153, 1187 (3d Cir. 1993). Here, plaintiff has not identified under which provision she intends to bring a RICO claim, so I will briefly address the relevant subsections of the federal statute, sections 1962(a)-(d). The New Jersey RICO statute is analogous to the federal law, and is construed in parallel. *See District 1199P Health and Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 518 n.17 (D.N.J. 2011); N.J. Stat. Ann. § 2C:41-2.

To establish a claim under 1962(a), "a plaintiff must allege: (1) that the defendant has received money from a pattern of racketeering activity; (2) invested that money in an enterprise; and (3) that the enterprise affected

---

issue with) is not an in-court statement made for the purposes of litigation. However, the notice itself is a court-issued document that came into being because of defendants' representations to the court in the removal action. Given the broad nature of New Jersey's litigation privilege—and the scope of the tort here, which is based on the allegedly defamatory *content* of the notice—I find application of the privilege appropriate.

[14]     Section 1964 provides:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

§ 1964(c).

interstate commerce." *Id.* at 1189 (citation omitted). Establishing a pattern of racketeering requires allegations of "at least two acts of racketeering activity within a ten-year period." 18 U.S.C. § 1961(5). Under section 1962(b), "a plaintiff must show injury from the defendant's acquisition or control of an interest in a RICO enterprise, in addition to injury from the predicate acts" of racketeering. *Lightning Lube,* 4 F.3d at 1190. To allege a claim under Section 1962(c), a plaintiff must plead conduct of an enterprise through a pattern of racketeering activity. *District 1199P,* 784 F.Supp.2d at 518-19 (citation omitted). Section 1962(d) prohibits conspiring to violate sections (a)-(c). 18 U.S.C. § 1962(d).

Before addressing Ms. Peterson's allegations, I touch on the litigation privilege (under the assumption that her RICO claim may rest on allegations about defendants' litigation conduct in state court). The Third Circuit has not addressed the issue of whether the litigation privilege bars RICO claims. However, at least one court in this district has held that the privilege does not bar federal RICO claims. *See Giles v. Phelan, Hallinan & Schmieg, L.L.P.*, Civ. No. 11-6239, 2013 WL 2444036, at *4 (D.N.J. June 4, 2013).[15] Accordingly, I will consider the merits of the RICO claim.

To say that plaintiff's RICO allegations are thin gives them too much credit. On the final page of her complaint, plaintiff requests "[d]amages pursuant to RICO statute." (Cplt. p. 28) RICO is not otherwise mentioned in the complaint. It is unclear whether plaintiff intends to rely on the federal or state RICO statute (or both), or on which statutory sections she relies. Regardless, she does not make allegations sufficient to support any type of RICO claim.

For starters, she does not identify defendants' predicate acts of racketeering, much less a pattern of such activity. See 18 U.S.C. § 1962(a)-(c) (requiring a pattern of racketeering activity). It is possible that she intends to

---

[15]   The Court in *Giles* did not consider whether the litigation privilege would bar a claim under New Jersey's RICO statute. Because I dismiss plaintiff's RICO claim on the merits, I do not consider the issue.

allege predicate acts of fraud. But reading the complaint this way, where plaintiff has made no attempt to allege a RICO claim other than mentioning the statute in her damages request, is a step too far. I have given the complaint a liberal construction, but defendants are also entitled to notice of plaintiff's claims.

As to RICO, the complaint fails to meet the minimal standards of Rule 8(a). I will dismiss the RICO claim for failure to state a cause of action.

## I.   Civil Rights Claims

In the introduction of the complaint, plaintiff alleges violations of her "constitutional rights" under "42 U.S.C. § 1983, The Privileges and Immunities Clause of Article IV, Section 2 of the Constitution, Due process rights … under the Fifth Amendment, and Fourteenth amendment, Equal Protection." (Cplt. p. 3) Plaintiff does not allege any separate constitutional counts in the complaint, but her allegations suggest that she intends to assert a claim under Section 1983.

Section 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Thus, to set forth a Section 1983 claim, a complaint must allege not only the violation of a right secured by the Constitution or laws of the United States, but also that the alleged deprivation was committed by a person acting under color of state law. *See Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011) (citations omitted); *see also West v. Atkins*, 487 U.S. 42, 48 (1988).

However, it is "possible" for a private party to be liable under Section 1983 if there is "a sufficiently close nexus between the State and the

challenged action [of the private party] so that the action of the latter may be fairly treated as that of the State itself." *Kost v. Kozakiewicz*, 1 F.3d 176, 184 (3d Cir. 1993) (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)).

The complaint includes a bevy of constitutional complaints, all which appear to be based on actions by the New Jersey state courts, either in the removal actions initiated by defendants, or during the injunctive relief proceedings initiated by Peterson following her eviction. To summarize, plaintiff alleges that the following actions by the state courts violated her constitutional rights: exercising jurisdiction in the landlord tenant action and issuing warrants of removal (Cplt. p. 4 § B); setting an "unknown higher standard" for in forma pauperis status and requiring plaintiff to pay filing fees (*Id.* § C); failing to "sua sponte consolidate" plaintiff's injunctive relief hearing with a trial on the merits (*Id.* § D); denying "Equal Protection" by failing to follow a New Jersey Supreme Court case on injunctive relief and eviction (*Id.* § E); refusing to process plaintiff's complaint without a physical address (*Id.* § F); vacating a default judgment (*Id.* § G); violating "due process rights" by accepting the proposed order of defendants (*Id.* § H); requiring plaintiff to return to New Jersey for a deposition (*Id.*); refusing to hear an interlocutory appeal (*Id.* § I); failing to enter default judgment. (*Id.* § J)

In response to these judicially-focused allegations, defendants point out (accurately) that the judiciary is immune from suit. *See Dongon v. Banar*, 363 F. App'x 153, 155-156 (3d Cir. 2010) (citing case law). In her opposition, Peterson clarifies that her claims are not against the judiciary or any individual judges, but against ESA and HVM, private parties. (*See* Dkt. No. 46 p. 10.) These private defendants, she says, are responsible for the actions of the state courts (which she deems unconstitutional) because defendants initiated removal proceedings against her and represented to the court that she was in arrears. (*See e.g.*, Dkt. No. 46 p. 11 ("Were it not for the chain of events defendant caused; defendant filing perjurious documents, that it knew was not true ... plaintiff would not, should not have been in a Landlord Tenant court

that claimed it had jurisdiction....”); *Id.* (constitutional violations “are actualized by defendant actions, by court decisions in conflict with ... fourteenth amendment....”); *Id.* p. 16 (“Defendant is the proximate cause of all the harms plaintiff pleads.”).

In addition, plaintiff appears to allege that defendants’ representations to the state courts, in conjunction with judicial action, constituted a “conspiracy” sufficient to meet the state action requirement of a 1983 claim.[16] (*See, e.g., id.* p. 16 (“Private parties who corruptly conspire with a judge in connection with such conduct are thus acting under color of state law within the meaning of § 1983.”) (internal citation omitted).)

Plaintiff again bases this claim on the statements made by defendants in the state court proceedings. Therefore, before assessing the merits of plaintiff’s 1983 claim, I must consider the applicability of the litigation privilege. While the Third Circuit has not addressed the application of the litigation privilege to Section 1983 claims, in *Giles*, the court noted that state privileges are unlikely to trump a federal cause of action. 2013 WL 2444036, at *4-5. With this reasoning in mind, I will proceed to consider the merits of Peterson’s Section 1983 claim.[17]

I find that Peterson’s allegations do not meet the minimal standards of Rule 8(a) as to a Section 1983 claim. As defendants note, ESA and HVM are private parties not subject to Section 1983. While private parties can be liable if they act in concert with state actors, plaintiff’s allegations that a conspiracy existed between defendants and the judges in the state court actions are conclusory. No supporting facts are suggested, much less stated. Peterson has

---

[16]   Defendants argue that I should not consider plaintiff’s conspiracy allegations, which are not explicitly made until plaintiff’s opposition brief. However, a liberal construction of plaintiff’s complaint could yield such a theory given that the allegations focus on the judiciary, a third-party state actor. Regardless, consideration of the conspiracy allegations does not change my assessment of the 1983 claim.

[17]   In *Loigman*, the New Jersey Supreme Court found that under New Jersey law, the litigation privilege would bar federal 1983 claims. *Loigman v. Twp. Comm. of Twp. of Middletown*, 185 N.J. 566, 585, 889 A.2d 426, 436 (2006). However, as the court in *Giles* noted, “the Court must apply federal law to the question of whether a state privilege bars a federal claim.” 2013 WL 2444036, at *5 (citation omitted).

offered no support for her conclusory contention that there was a conspiracy with a judge. (And, in fact, several judges presided over the state court actions.) I also note that Peterson herself was a winner in state court when she succeeded in having the landlord tenant actions dismissed for lack of jurisdiction. Claims of legal error, or unhappiness with the ultimate outcome of the state court proceedings, do not suffice to establish a Section 1983 claim. Therefore, the Section 1983 claim will be dismissed.

## III.  CONCLUSION

For the foregoing reasons, the motion to dismiss is DENIED IN PART AND GRANTED IN PART.

Defendants' 12(b)(2) motion based on lack of personal jurisdiction is GRANTED. The complaint is DISMISSED in its entirety as to the investors, defendants Blackstone, Centerbridge, and Paulson.

As to defendants' 12(b)(6) motion with respect to the claims against ESA and HVM:

The motion is DENIED as to Plaintiff's claims of breach of contract, breach of the covenant of good faith and fair dealing, malicious prosecution/abuse of process, and intentional infliction of emotional distress. The action will go forward based on these claims, against defendants ESA and HVM only.

The motion is GRANTED as to all other claims, which are DISMISSED.

As to the claims dismissed solely for failure to meet pleading standards, RICO and Section 1983, the dismissal is without prejudice to a motion to file an amended complaint within 30 days.  An appropriate order will be entered.

Dated: March 3, 2016
Newark, New Jersey

**KEVIN MCNULTY**
**United States District Judge**

29