ANDREA PETERSON,

        **Plaintiff,**

v.

HVM L.L.C., EXTENDED STAY
AMERICA (ESA), CENTERBRIDGE
PARTNERS LP, PAULSON &
COMPANY, AND BLACKSTONE REAL
ESTATE PARTNERS VI

        **Defendants.**

Civ. No. 14-1137 (KM) (JBC)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

Andrea Peterson, *pro se*, brought this action against HVM L.L.C. ("HVM"), Extended Stay America ("ESA"), Centerbridge Partners LP ("Centerbridge"), Paulson & Company ("Paulson"), and Blackstone Real Estate Partners VI ("Blackstone"). On motion (DE 32), I dismissed all claims against Centerbridge, Paulson, and Blackstone (the "Investors."), as well as certain other claims against ESA and HVA. (DE 52). Now before the Court is the motion of ESA and HVA (for purposes of this Opinion, the "Defendants") for summary judgment on the remaining counts of the complaint (DE 141), as well as Ms. Peterson's cross motion for a stay. (DE 150).

For the reasons set forth below, I will grant the motion of the Defendants, ESA and HVM, for summary judgment and deny Ms. Peterson's cross motion for a stay.

## I. Summary[1]

### a. Background

#### i. The Agreement

On or about February 19, 2009, Ms. Peterson entered into the Long Term Lodging Agreement (the "Agreement") with the Defendants, pursuant to which Ms. Peterson became a guest at the Extended Stay of America Secaucus Hotel (the "Hotel"). (DSF ¶ 22). Ms. Peterson and Defendants are in accord that the Agreement is a valid contract. (DSF ¶ 23). The Agreement contains a commencement date of February 18, 2009. (DSF ¶ 24). The terms and construction of the Agreement are discussed at Section III.b.2, *infra*.

#### ii. The Lodging Fee

The original Lodging Fee and the original payment period for the Lodging Fee are both unclear; Ms. Peterson redacted that information from the only copy of the Agreement that is before the Court. (DSF ¶ 31). Defendants allege that, since 2009, they have demanded in writing that the Lodging Fee be paid every 30 days. (DSF ¶ 32). Ms. Peterson alleges similarly, though not identically, that the Lodging Fee was to be paid monthly. (DE 150). By 2010, Defendants had already filed at least one lawsuit against Ms. Peterson for failing to pay the Lodging Fee. (DSF ¶ 34).

Defendants assert that they served Notices to Cease and terminated the Agreement, placing Ms. Peterson in holdover status. (*See* Section III.b.2.b, *infra*.) On April 1, 2012, pursuant to the holdover provisions of the Agreement, they began charging a Lodging Fee of $33.00 per day, due every 30 days (33 x 30 = $990). (DSF ¶ 35). Ms. Peterson admits that she never paid $33.00 per day for the Lodging Fee after April 1, 2012. (DSF ¶ 36). She asserts that the

---

[1]    For ease of reference, certain key items from the record will be abbreviated as follows:

| "Cplt." | = | Ms. Peterson's Complaint | [DE 10] |
| "DSF" | = | Defendants' Statement of Facts | [DE 141-34] |

Lodging Fee should have remained at the rate of $900 per month, not the holdover rate of $990 per 30-day period. (DE 150).

### iii. Eviction Proceedings

By March of 2012, Ms. Peterson had stayed at the Hotel for over three years. (DSF ¶ 37). In March of 2012, in an effort to start the eviction process, Defendants allege that they sent Ms. Peterson a Notice to Cease. The Notice informed her that she was in arrears in the amount of $174.34. (DSF ¶ 40). It states that the holdover Lodging Fee of $33 per day was thereafter to be paid every 30 days, pursuant to the Agreement. (DSF ¶ 38).

Defendants allege that they sent Ms. Peterson follow-up Notices to Cease on March 29, 2012, April 30, 2012, May 29, 2012, and June 27, 2012. (DSF ¶ 39). Ms. Peterson alleges that she did not receive any of those Notices to Cease. (DE 150-5, 2, ¶1(b)).

Each Notice to Cease states that Ms. Peterson is behind on her rent, states an outstanding balance,[2] and warns that she may be evicted if she does not pay her rent. (DSF ¶¶ 40, 41, 42, 43). Each Notice to Cease also reiterates that, pursuant to the notice sent to Ms. Peterson on February 7, 2012, her Lodging Fee increased to $33 per day as of April 1, 2012. (DSF ¶¶ 40, 41, 42, 43). Also, starting March 29, 2012, each Notice to Cease stated that the Lodging Fee of $990 (*i.e.*, $33 x 30) would be due and payable every 30 days. (DSF ¶¶ 41, 42, 43). The Notices to Cease also updated Ms. Peterson on the consecutive number of months her account was past due. (*Id.*).

A Notice to Cease is a typical business record kept in the ordinary course of business. It is mailed to the address listed on the notice and is delivered directly to the guest by sliding a copy under the door of the room listed on the

---

[2]    The Notice to Cease dated March 29, 2012 states that Ms. Peterson has an outstanding balance of $174.34. (DSF ¶ 40). The Notice to Cease dated April 30, 2012 states that Ms. Peterson has an outstanding balance of $204.34. (DSF ¶ 41). The Notice to Cease dated May 29, 2012 states that Ms. Peterson has an outstanding balance of $174.34. (DSF ¶ 42). The Notice to Cease dated June 27, 2012 states that Ms. Peterson has an outstanding balance of $228.34. (DSF ¶ 43).

notice. (DSF ¶ 45). Ms. Peterson acknowledges that the address on the Notices to Cease, New York P.O. Box 582, New York, NY 10108 (the "New York P.O. Box"), was the address for notices specified in the Agreement, and that it remained her valid mailing address through 2012. (DSF ¶ 44). The room listed on the notice, which Ms. Peterson admits was her residence address, was Room 507 at the Hotel. That room, at One Plaza Drive in Secaucus, New Jersey, is listed on the Notices to Cease dated May 29, 2012 and June 27, 2012. (DSF ¶ 46).

Despite the alleged Notices to Cease, Ms. Peterson continued to pay at the prior rate of $900 per month. (DSF ¶ 47). Ms. Peterson alleges that this was "consideration in full." (DE 150). Although the first Notice to Cease was triggered by accrued arrearages in the original Lodging Fee, the Defendants focus here on the post-Notice to Cease Lodging Fees at the holdover rate. (*See* DSF ¶ 34–35) ("By 2010, Defendants had already filed at least one lawsuit against Plaintiff for failing to pay the Lodging Fee as required by the Agreement . . . Additionally, regardless of what the Lodging Fee was in 2009, on April 1, 2012 Defendants raised the Lodging Fee to $33 per day, due every 30 days, as they were permitted to do pursuant to the Agreement.")(internal citations omitted).

### iv. Landlord-Tenant Actions

On or about June 21, 2012, Defendants initiated a landlord/tenant action against Ms. Peterson in Hudson County (the "June Action") for her "refusal to pay the $33 per day Lodging Fee, her habitually late payments, and her refusal to comply with the four Notices to Cease." (DSF ¶ 48) (citing DE 141-13). The Defendants' statement of facts cites the June 2012 complaint for a then-current arrearage of $483.34. (*Id.*) (citing 141-13)) The June 2012 complaint itself, however, does not contain that figure, but claims $1,164.34 in base rent through June 30, 2012. (DE 141-13, 3)] The summons attached to the complaint includes a notice stating as follows: "the purpose of the attached complaint is to permanently remove you and your belongings from the premises." (DSF ¶ 49). The affidavit of service reflects that a court officer left it

at her hotel room after knocking on the door. (*Id.*) Ms. Peterson claims she did not receive notice of the June Action. (DSF ¶ 50).

On August 17, 2012, however, Ms. Peterson received a letter from the Hudson County Superior Court at her Hotel room. She admittedly understood that the letter had legal implications. (*Id.*). Instead of opening the envelope, however, she wrote on the front of the envelope that her correct mailing address was the New York P.O. Box (the same address to which Defendants had sent the notices to cease). (DSF ¶ 51).

On or about August 7, 2012, Defendants filed a second landlord/tenant action against Ms. Peterson (the "August Action"). This complaint alleged that she continued to habitually pay the Lodging Fee late and was $1,563.34 in arrears. (DSF ¶ 52; DE 141-17). The summons for the August Action included a notice stating that eviction was sought: "the purpose of the attached complaint is to permanently remove you and your belongings from the premises." (DSF ¶ 54; a copy of the August summons is not provided, however.). On or about September 4, 2012, Ms. Peterson was served with the copy of the summons and complaint in the August Action. (DSF ¶ 53).

On September 5, 2012, Ms. Peterson performed an online search of New Jersey public records. (She admits that she did so based on the June complaint, but she is not clear about the circumstances under which she received the June complaint or the August one.)[3] That online search confirmed that Defendants had filed landlord/tenant actions against her and sought her removal from the Hotel. (DSF ¶ 55). The court clerk for Hudson County

---

[3]     The record here is confused, but the upshot is that Ms. Peterson at this point was on notice that she was being sued. The Defendants cite to the docket list (DE 141-16), the August complaint (DE 141-17), and Ms. Peterson's deposition (DE 141-3 at 240:20-241:17). In her deposition, Ms. Peterson does not forthrightly state that she was served with the summons, but she does say that the June complaint (labeled Defendant's exhibit 9) was the one that prompted her to begin her investigation on September 5, 2012. (See DE 141-12, ¶¶ 4–5). She states that she learned about the case at about same time that she "filed the show cause." (DE 141-3 at 241:18-23). From the docket, it is not clear what "show cause" is meant. (See docket list (DE 141-16).).

Superior Court also told Ms. Peterson that Defendants had filed two lawsuits against her because they "want you to leave" the hotel. (DSF ¶56).

Between September 4, 2012 and October 3, 2012, Ms. Peterson did not take any steps to look for alternative housing. (DSF ¶ 57). Ms. Peterson states that she felt that she had met all of her obligations to Defendants and wished to remain because she had a good rate. (DSF ¶ 57).

On October 2, 2012, the landlord-tenant court held a hearing concerning the June and August Actions (the "October Court Hearing"). (DSF ¶ 58). During the October Court Hearing, Ms. Peterson declared that she did not want to be considered a tenant and wanted to be treated as a guest of the Hotel pursuant to the terms of the Agreement. (DSF ¶ 59). In response, the landlord/tenant court vacated a default judgment against Ms. Peterson in the June Action, finding that because no landlord/tenant relationship existed between the parties, there was no jurisdiction to hear the action in landlord/tenant court. (DSF ¶ 60).[4]

When the landlord-tenant court vacated the default judgment in the June action, Defendants voluntarily withdrew the August landlord-tenant Action. (DSF ¶ 61). Ms. Peterson asserts that "when HVM/ESA and its management learned, it management and attorney was in court and heard the judgment vacated, it had no judgment, at no time did it contact me." (*sic;* DE 150 ¶ 75. *See also* DE 150 ¶ 100.).

---

[4] The Landlord-Tenant court's order, attached as an Exhibit to Ms. Peterson's complaint, reads as follows:

> IT IS ON THIS 2nd DAY OF October, 2012,
>
> ORDERED that
>
> The Default Judgment as previously entered is vacated. Ms. Peterson states to the Court that she is not a tenant/resident but is a Guest of HVM trading as ESA.
>
> This Court has no jurisdiction to hear this matter, in Landlord tenant court.
>
> Docket # LT 9118-12 is withdrawn by the plaintiff.

(DE 10-1 p. 43).

On October 3, 2012, Defendants denied Ms. Peterson access to her room and stated that she would be denied access to the Hotel. (DSF ¶ 62). She was permitted to collect her belongings. Ms. Peterson signed a document acknowledging that she had collected all of her personal items from the Hotel and that no items were missing. (DSF ¶ 65).[5]

### b. Ms. Peterson's relationship with Safeguard Storage

On or about December 10, 2008 (*i.e.*, before entering in the Agreement with Defendants), Ms. Peterson entered into a Self-Service Storage Rental Agreement (the "Storage Agreement") with Safeguard Self-Storage ("Safeguard") located in Garfield, New Jersey. (DSF ¶ 66). Safeguard is not a party to this action or this motion.

Pursuant to the Storage Agreement, Ms. Peterson rented a storage unit (the "Storage Unit") and was required to purchase fire, theft, and casualty insurance on her belongings if her property's value exceeded $1,000. (DSF ¶ 67–68). Ms. Peterson admits she never took out insurance on her items in the Storage Unit. (DSF ¶ 69).

In 2012, Ms. Peterson stopped making payments for her Storage Unit. (DSF ¶ 70). She admits that she understood that her failure to make payments would result in the contents of her Storage Units being sold at auction. (*Id.*).

Between February and June of 2013, Safeguard sent Ms. Peterson several notices and had numerous phone calls with Ms. Peterson regarding her overdue storage payment fees. (*Id.*).

On June 5, 2013, the Safeguard facility manager, Jason Villar, inspected the contents of Ms. Peterson's Storage Unit and prepared a corresponding property inventory (the "Property Inventory"). (DSF ¶ 73). The Property Inventory estimated the value of the items in her Storage Unit to be $500. (*Id.*). The Property Inventory was addressed to Ms. Peterson's New York P.O. Box.

---

[5]   At Ms. Peterson's deposition, she claimed that she was missing a bag of dead bugs, but that those missing items are "not a big deal." (DSF ¶ 65).

Ms. Peterson alleges that she stored valuable items, such as a mezzotint by G.H. Rothe (which, she says, is valued at $19,000.00) and a Henredon section sofa with ottoman (which, she says, are valued at $15,000), in the unit. (DE 10-1, 76). Mr. Villar does not recall seeing any such valuable items in the Storage Unit. (DSF ¶ 75).

On July 15, 2013, Safeguard warned Ms. Peterson in an e-mail that her account was past due and had gone into default in January 2013, and that the contents of the Storage Unit would be sold at public auction on July 23, 2013. (DSF ¶77). On that same date, Safeguard also offered Ms. Peterson the opportunity to reclaim all of her belongings if she paid 50% of her outstanding balance. (DSF ¶ 78).

On July 22, 2013, the contents of Ms. Peterson's Storage Unit were sold at auction. (DE 79; 81). That morning, Safeguard had given Ms. Peterson the opportunity to reclaim her belongings even if she was unable to pay the balance owed. (DSF 79). Ms. Peterson failed to do so. (DSF ¶80).

### c. Procedural history

I lay out only such portions of this case's convoluted procedural history as may relate to the motions now before the Court.[6]

On January 24, 2014, Ms. Peterson, who had moved to Georgia, filed her complaint with the United States District Court for the Northern District of Georgia. (Cplt.). The complaint names as defendants ESA, HVM, and the Investors. (Id.). The complaint asserts a number of claims arising out of Ms. Peterson's alleged eviction, including breach of contract, intentional infliction of emotional distress, and fraud. (Id.). Ms. Peterson also argued that the proceedings in state court violated her constitutional rights. (Id.). The

---

[6]  The Court has extended itself to ensure that Ms. Peterson was updated on the record of this case. Ms. Peterson has from time to time claimed that items mailed to her or by her were never received. On April 13, 2016, I partially granted Ms. Peterson's request (DE 62) to receive ECF notices both electronically and by mail. (DE 64). I ordered the clerk to mail Ms. Peterson copies of any orders filed by the Court, and ordered the defendants to mail to Ms. Peterson courtesy copies of any future submissions. (DE 64).

complaint requests damages stemming from the eviction, litigation costs, and compensation for pain and suffering. (Cplt., ¶¶ 27–28). Ms. Peterson alleges that "[d]efendants['] actions cause[d] [her] financial ruin," destroyed her credit, caused her personal items to be sold at auction, and "caused plaintiff extreme emotional pain, devastation." (Cplt., p 3).

On February 21, 2014, venue of the case was transferred to the United States District Court for the District of New Jersey, where it was assigned to me.

On January 28, 2015, the Investors, ESA, and HVM moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(2) and (b)(6). (DE 32). Ms. Peterson opposed that motion. (DE 46).

On March 3, 2016, I issued an opinion (DE 51) and order (DE 52) granting in part and denying in part the motion to dismiss. Under Rule 12(b)(2), I dismissed the complaint in its entirety as against the defendant Investors. (DE 51, 52). As against defendants ESA and HVM, I partially granted the 12(b)(6) motion. (*Id.*) The following claims against ESA and HVM survived the motion to dismiss: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing, (3) malicious prosecution/abuse of process, and (4) intentional infliction of emotional distress. (*Id.*).

On March 29, 2016, Ms. Peterson filed a letter containing several requests, including a request to file an amended complaint. (DE 56). On April 4, 2016, I granted Ms. Peterson a thirty-day extension (*i.e.*, until May 6, 2016) to file an amended complaint. (DE 57).

Also on April 4, 2016, Ms. Peterson filed a notice of appeal from my opinion and order on the defendants' motion to dismiss. (DE 60). She also filed a motion for extension of time to file an interlocutory appeal. (DE 59). On April 11, 2016, I issued a memorandum and order granting Ms. Peterson's motion for an extension to the extent necessary to render her notice of appeal timely. (DE 61).

On April 29, 2016, Ms. Peterson filed an amended notice of appeal. (DE 69). Also on April 29, 2016, ESA and HVM filed a letter requesting an extension

9

of time to file their answer. (DE 67). The same day, anticipating that an amended complaint might soon be filed, I granted ESA and HVM a fourteen-day extension to file their answer. (DE 71).

On May 16, 2016, Ms. Peterson moved for a stay pending appeal. (DE 72). On May 19, 2016, I denied that motion. (DE 73).

On May 20, 2016, ESA and HVM filed their answer to the complaint. (DE 74).

On June 14, 2016, Ms. Peterson moved for an extension of time to file a response to ESA and HVM's answers. (DE 78). On June 16, 2016, I denied Ms. Peterson's motion as moot. (DE 79). On June 23, 2016, Ms. Peterson moved for reconsideration of that order. (DE 81). On June 27, 2016, I denied Ms. Peterson's motion for reconsideration. (DE 83). On July 5, 2016, Ms. Peterson filed a notice of appeal from my original order (DE 79) on Ms. Peterson's motion for an extension. (DE 85).

On August 8, 2016, Ms. Peterson filed a motion to stay. (DE 88). On August 9, 2016, by letter order, I granted Ms. Peterson's motion to stay during the pendency of her appeal. (DE 89). On August 11, 2016, the Third Circuit dismissed both of Ms. Peterson's appeals for lack of jurisdiction, as there had been no final decision in the case. (DE 90, 91).

A series of motions regarding discovery and settlement ensued. I do not summarize them here. Fact discovery was completed.

On April 6, 2018, ESA and HVM moved for summary judgment. (DE 141). On April 19, 2018, Ms. Peterson moved for an extension of time to file a response to defendants' motion for summary judgment. (DE 142). On April 26, 2018, Magistrate Judge Clark granted her 30 days from the date of the order to file her opposition. (DE 143). On May 15, 2018, Ms. Peterson filed a Fed. R. Civ. P. 72 objection to Judge Clark's order. (DE 144). On July 18, 2018, I denied Ms. Peterson's Rule 72 motion. (DE 145, 146). On August 13, 2018, in response to my decision, Ms. Peterson moved for reconsideration (DE 147), which I denied (DE 148).

As of September 18, 2018, I still had received no response to Defendants' motion for summary judgment. I issued a memorandum and procedural order requiring that any response be filed by Ms. Peterson on or before October 23, 2018, and that if no response was received, the Defendants' motion might be treated as unopposed and granted. (DE 149). On October 23, 2018, Ms. Peterson filed an opposition to Defendants' summary judgment motion, as well as another motion to stay. (DE 150, DE 150-6).

## II.    Ms. Peterson's Motion for a Stay

Before addressing Defendants' summary judgment motion, I will briefly address Ms. Peterson's latest motion for a stay.

Ms. Peterson moves to stay proceedings in this matter pending the outcome of her request that (now former) U.S. Attorney General Jeff Sessions to investigate a matter that primarily involves a non-party, AT&T, but also contains allegations against Defendants and others. (DE 150).

Motions to stay are addressed to the district court's discretion. *See Bechtel Corp. v. Local 215, Laborers' Int'l Union of N. Am.*, 544 F.2d 1207, 1215 (3d Cir.1976) (a district court may stay proceedings "[i]n the exercise of its sound discretion"). However, motions to stay should be granted when the party has presented adequate excuse, such as illness, and the motion: (1) does not unduly prejudice another party, (2) was not made in bad faith, or (3) was not made merely to procrastinate. *See Gaspar v. Kassm*, 493 F.2d 964, 969 (3d Cir.1974).

Several times throughout this litigation, Ms. Peterson has moved to stay proceedings. (DE 72, 88, 110). When appropriate—for example, when Ms. Peterson stated that she was recovering from surgery or when she had appealed one of my orders—I granted a stay. (DE 89, 113). In this instance, however, I will not exercise my discretion to stay the proceedings. First, much of the motion consists of fruitless reargument of prior orders of the Court. (DE 150). Second, Ms. Peterson's motion to stay is based on factual allegations wholly separate from the claims she has brought in this complaint. She alleges,

for example, that AT&T, the Defendants, and others participated in a conspiracy to commit copyright violations against her. (DE 150). For those reasons, I perceive no adequate grounds for a stay of this action.

It appears that Ms. Peterson has brought this motion to stay to avoid or delay a decision on the Defendants' summary judgment motion. The arguments are to a great degree directed against that motion for summary judgment. Ms. Peterson's cover letter to the motion states that it serves as both a motion to stay and as her opposition to the summary judgment motion. I will therefore consider this filing as her opposition. (*See* DE 150-6).

### III. Summary Judgment

#### a. Legal standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). The opposing party must present actual

evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992).

Here, Ms. Peterson, the nonmoving party, is appearing *pro se*. "Where the plaintiff is a *pro se* litigant, the court has an obligation to construe the complaint liberally." *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009) (citing *Haines v. Kerner*, 404 U.S. 519, 520-521 (1972); *Gibbs v. Roman*, 116 F.3d 83, 86 n. 6 (3d Cir. 1997)). I have construed Ms. Peterson's pleadings and filings in that liberal spirit. Ms. Peterson has made a number of written submissions explaining her position; some are explicitly are directed to the summary judgment motion and some are not, but I have considered them all. For purposes of this motion, I have generally treated her factual contentions as if they had been contained in sworn affidavits.

I now consider Ms. Peterson's remaining claims in the following order: breach of contract, breach of the implied covenant of good faith and fair dealing, and the tort claims.

### b. Breach of contract

Ms. Peterson alleges that the Defendants breached the Agreement by bringing the landlord-tenant actions and by evicting her from the Hotel without thirty days' notice. (Cplt. 1–2, ¶¶ 23–25). Those actions, she alleges, "caused [her] financial ruin," destroyed her credit, caused her personal items to be sold at auction, and inflicted "extreme emotional pain, devastation." (Cplt. p. 3). On summary judgment, the Defendants argue that they did not breach the Agreement, and that no evidence exists to show that they violated any contractual obligation to Ms. Peterson. (DE 141-1, pp. 14–15).

Ms. Peterson's claim, to the extent it arises from the terms of her tenure at this lodging facility, is not a landlord-tenant claim, but is limited to breach of contract. First, Ms. Peterson insisted in Landlord-Tenant court that she was not Defendant's tenant, but a hotel guest. (DSF ¶ 59). It was on the basis of that representation that the Landlord-Tenant court ruled that it had no jurisdiction and vacated its default judgment against Ms. Peterson. (DSF ¶ 60). The Defendants, in reliance on Ms. Peterson's position and the resulting court ruling, withdrew their remaining landlord-tenant action. (DSF ¶ 61).[7] Second, Ms. Peterson continues to deny that she and the Defendants had a landlord-tenant relationship. (DE 150-5). Indeed, she presses breach-of-contract claims against the Defendants based upon their having wrongly sued her as a tenant.

In short, the landlord-tenant court ruled that it had no jurisdiction because Ms. Peterson was not a tenant; in court, Ms. Peterson explicitly waived her rights to be treated as a tenant; and she continues to insist that she is not a tenant. I therefore take her contractual claims at face value, as claims of breach of the parties' Agreement.

---

[7] The Landlord-Tenant court's order (DE 10-1 p. 43) is quoted in full at n. 4, *supra.*

To establish a breach of contract claim, a plaintiff bears the burden to prove four elements: (1) the parties entered into a valid contract; (2) the plaintiff performed under the contract; (3) the defendant breached the contract; and (4) the defendant's breach caused damages to the plaintiff. *Globe Motor Co. v. Igdalev*, 225 N.J. 469, 482 (2016). "A valid contract is deemed breached if one of the parties to the agreement does not fulfill a contractual obligation that it owes to the other party under the contract." *Hibbert*, 937 F. Supp. at 580. Because the goal of contract law is to place the claimant in the same position as if the contract had been performed, "a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract." *Marina Dist. Dev. Co., LLC v. Ivey*, 223 F. Supp. 3d 216, 221 (D.N.J. 2016), judgment entered, No. CV 14-2283(NLH/AMD), 2018 WL 4089025 (D.N.J. Aug. 28, 2018) (citing *Totaro, Duffy, Cannova and Company, L.L.C. v. Lane, Middleton & Company, L.L.C.*, 921 A.2d 1100, 1107 (2007)). "The non-breaching party must demonstrate, however, that in order to be compensable, the loss must be a reasonably certain consequence of the breach." *Id.*[8]

Here, neither party disputes that the Agreement is a valid contract. (DE 141-34, ¶ 23) (citing DE 141-8, 12, ¶ 6). The other three elements, however, remain in contention: whether Defendants performed under the contract, whether Ms. Peterson performed under the contract, and whether Defendants' alleged breach, if it occurred, caused damages to Ms. Peterson. (DE 141-1, 14–

---

[8]     The parties do not dispute that New Jersey law applies, and I find it to be consistent with federal Rule 56 procedural standards. Under New Jersey law, as interpreted by this federal court, "summary judgment may be entered in a case where the court is asked to construe contractual clauses that are clear and unambiguous despite the parties' differing views as to what consequences flow from those provisions." *Hibbert v. Bellmawr Park Mut. Hous. Corp.*, 937 F. Supp. 2d 565, 580 (D.N.J. 2013) (Hillman, J.). "If the nonmoving party presents a reasonable alternative reading of the contract, then a question of fact as to the meaning of the contract exists which can only be resolved at trial." *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 418–19 (3d Cir. 2013). In aid of interpretation, the court must consider all relevant evidence. *Id.* at 419. Such evidence includes, for example, "the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct." *Id.*

25). Finding no sufficient evidence that the Defendants breached the Agreement, I enter summary judgment in their favor on the contract claim.

### i. Defendant's alleged breaches

Ms. Peterson claims that the Defendants breached the Agreement by bringing the landlord-tenant actions against her (Cplt. pp. 1–2), and by failing to give her 30 days' notice before excluding her from her Hotel room. (Cplt. p.2 ¶¶23–25).

As to (1) the filing of the landlord-tenant actions, the evidence demonstrates that the Defendants acted properly and did not commit any breach of the Agreement (Section III.b.i.1, *infra*).

As to (2) the alleged failure to give 30 days' notice of termination, the evidence demonstrates

(a) that Ms. Peterson was on notice of Defendants' intent to terminate, at the latest, when she received notice that they had brought an action for eviction (Section III.b.i.2.a, *infra*); **or**, in the alternative,

 (b) that even earlier, Ms. Peterson must be deemed to have received multiple Notices to Cease mailed to her address of record and left at her room door (Section III.b.i.2.b, *infra*).

### 1. Landlord-tenant actions

First, I consider whether Defendants breached the agreement by filing the landlord/tenant actions. The breach, if any, must be an implied one; Ms. Peterson has not cited to any provision in the Agreement that would prohibit Defendants from filing a landlord/tenant action.

Ms. Peterson stayed at the Hotel pursuant to a renewable 90-day Agreement, not a lease. Nevertheless, the Defendants acted conservatively, and not unreasonably, in considering that Ms. Peterson' three-year stay might have conferred upon her the status of a *de facto* tenant. *See* N.J. Stat. Ann. § 2A:18–61.1; *McNeill v. Estate of Lachmann*, 666 A.2d 996, 998–99 (App. Div. 1995) (finding that guests who stayed at a hotel for over three years had obtained tenant status). Assuming that to be the case, a Notice to Cease is one of the

16

prerequisites for a landlord's filing of a landlord-tenant action to evict a delinquent tenant. *See* N.J. Stat. Ann. § 2A:18-61.1 (grounds for removal of tenants); *Ivy Hill Park, Section III, Inc. v. Abutidze*, 852 A.2d 217, 224–225 (App. Div. 2004).

After Ms. Peterson failed to respond to the Notices to Cease or pay the arrearage, the Defendants filed the June and August landlord/tenant actions. In doing so, they cautiously extended Ms. Peterson what amounted to the superior rights of a tenant. Had they not done so, they might well have exposed themselves to liability for circumventing Ms. Peterson's rights as a *de facto* tenant. Ms. Peterson, however, disclaimed tenant status and thereby obtained relief from a default judgment of eviction in landlord-tenant court. In reliance on the court's acceptance of that disclaimer, the Defendants withdrew the remaining proceeding. At that point, landlord-tenant procedures were abandoned.

None of this, in my view, can be traced to a breach of any provision of the Agreement.

### 2. Notice of termination

I next consider Ms. Peterson's contention that the Defendants breached the Agreement by excluding Ms. Peterson from her room at the Hotel on October 3, 2012 without the requisite advance notice. (Cplt. p. 2 ¶¶23–25). Here, Ms. Peterson relies on the notice provisions of the termination clause of the Agreement. That clause permits either party to terminate, but requires 30 days' written notice:

> Unless otherwise superseded by the laws of this State and the notwithstanding any other provision of this Lodging Agreement, either party may terminate this Agreement upon thirty (30) days' written notice to other party. This Lodging Agreement will be deemed terminated at 11:00a.m. on the thirtieth (30th) day following receipt of this notice.

(DE 141-9 p. 2).

Ms. Peterson appears to acknowledge that the Agreement was terminable by either party for any reason. She alleges, however, that when Defendants excluded her from her room on October 3, 2012, they had not previously provided the required 30 days' written notice. (*Id.*)

I find from the facts of record that, at the latest, Ms. Peterson was placed on notice of the Defendants' intent to terminate when they brought an action for eviction. (*See* subsection a, *infra.*) must be deemed to have received multiple Notices to Cease that would also have placed her on notice of the Defendants' intent to terminate. (*See* subsection b, *infra.*) Either of these alternatives would suffice; the first, however, is perhaps more factually straightforward.

### a. The eviction proceedings as notice of termination

Defendants argue that, at the latest, Ms. Peterson surely obtained notice that Defendants were terminating the Agreement when she learned she had been sued in landlord-tenant court for eviction. (DE 141-1, 16–17). They add that Ms. Peterson's active avoidance of court notifications requires a ruling that she was on constructive notice or is equitably estopped from claiming lack of notice. (DE 141-1, 16–17).

A letter from the court in Hudson County, dated August 17, 2012, notified Ms. Peterson that the Defendants' landlord/tenant action had been filed in June. (*Id.*). At her deposition, Ms. Peterson admitted that she received the August 17, 2012 letter from the Hudson County Court. She admitted that Defendants caused it to be delivered to her hotel room. She admitted that she saw the envelope and knew it had "legal implications." (DE 141-34, ¶ 50). Rather than open the August 17, 2012 letter, however, Ms. Peterson wrote her New York PO Box on the envelope and had the front desk of the Hotel photocopy it. (DE 141-34 ¶ 51). Despite those admissions, Ms. Peterson says that she did not actually receive the August 17, 2012 letter or any other letters from the landlord-tenant court. (DE 141-3 at 244:20-249:11).

Defendants argue that, by receiving the envelope, recognizing its implications, and attempting to divert it elsewhere, Ms. Peterson was placed on actual or constructive notice of the eviction action (and *a fortiori* of Defendants' intent to terminate the Agreement). Constructive notice "is a legal inference or presumption; it is a fiction by which, for the promotion of sound policy or purpose, the legal rights and interests of the parties are treated as though they had actual notice or knowledge." *Black v. Pub. Serv. Elec. & Gas Co.*, 237 A.2d 495, 499 (App. Div. 1968). Whether a party was put on constructive notice can of course present a question of fact for the jury. 66 C.J.S. Notice § 32. In light of the facts now before the Court, as well as Ms. Peterson's admissions, I find that no such factual issue is presented, as explained below.

An alternative way to view the matter is through the lens of equitable estoppel. That doctrine, in its classic form, is as follows:

> [A] party may be precluded by its own act or omission from . . . pleading or proving an otherwise important fact. It is the principle by which a party is precluded from denying any material fact, induced by his or her words or conduct upon which a person relied, whereby the person changed his or her position in such a way that injury would be suffered if such denial or contrary assertion was allowed.

28 Am. Jur. 2d Estoppel and Waiver § 27. New Jersey law also contains a doctrine of quasi-equitable estoppel, under which "an individual is not permitted to 'blow both hot and cold,' taking a position inconsistent with prior conduct, if this would injure another, regardless of whether that person has actually relied thereon." *Heuer v. Heuer*, 704 A.2d 913, 918 (1998). Estoppel has been applied to bar denial of notice. *See Vargas v. Camden City Bd. of Educ.*, No. CIV. 05-778 (JBS), 2006 WL 840393, at *6 (D.N.J. Mar. 28, 2006) (estopping parties from claiming they did not have proper notice under the TCA).

Here, Ms. Peterson denies that she received the August 17, 2012 letter from Hudson County, but her denial is technical at best. What she admits is that she received the envelope containing that letter and recognized it had

"legal consequences," but decided to leave it unopened and redirect it to her mailing address. (DE 141-34, ¶¶ 50–51). Whether as a matter of constructive notice or under the doctrine of equitable estoppel, a party cannot avoid notice by simply refusing to open an envelope she admittedly received. She cannot be permitted to gain an advantage by purposefully closing her eyes. On the admitted facts, the August 17, 2012 envelope, if opened, would have provided more than 30 days' written notice that the Defendants wished to terminate the Agreement. Ms. Peterson cannot legally claim lack of notice, or indefinitely deny the other party the ability to exercise its contractual rights, based on her deliberate decision not to open the envelope.

To remove doubt, however, I also consider service of the June landlord/tenant summons and complaint on September 4, 2012. (DE 141-34, ¶ 53). The summons informed Ms. Peterson that the purpose of the action was to "permanently remove you and your belongings from the premises." (DE 141-34, ¶ 54). Ms. Peterson admits that as of that date, she possessed the June summons and complaint, which were based on underpayment and late payment of Lodging Fees. Indeed she testified that it was in response to her receipt of those documents that she conducted an online search the following day, September 5, 2012. That search confirmed that Defendants had filed suit to remove her from the Hotel. (DE 141-34, ¶ 55).

Ms. Peterson denies receiving 30 days' notice that the Defendants were terminating the agreement. (*See, e.g.,* Cplt. p. 2 ¶¶23–25). That assertion is inconsistent with her own evidence, as well as the documentary evidence. A party may not defeat summary judgment by simply refusing to acknowledge the legal significance of admitted facts.[9]

Based on the August 17, 2012 letter, I find that Ms. Peterson by then, at the latest, had over 30 days' notice of the Defendants' intent to terminate the

---

[9]     Nor may she create a "factual issue" by contradicting herself, or by submitting an affidavit that contradicts prior deposition testimony. *Jiminez v. All Am. Rathskeller, Inc.,* 503 F.3d 247, 254 (3d Cir. 2007). Although I have indulged Ms. Peterson in this regard, I do note that her denials are not generally in the form of an affidavit.

Agreement. That was confirmed by her admitted receipt of the June summons and complaint by September 4, 2012.[10]

By virtue of the eviction proceedings, Ms. Peterson received 30 days' notice of the Defendants' intent to terminate the Agreement.

### b. Holdover status and Notices to cease

A second, alternative route to summary judgment on the issue of notice—more straightforward legally, if perhaps more complex factually—is the Defendants' argument that Ms. Peterson was placed in holdover status, or at the very least notified of the Defendants' intent to terminate, as a result of her receipt of multiple Notices to Cease.

The Defendants argue that they did not breach the termination provision because, when they denied Ms. Peterson access to the Hotel on October 3, 2012, the period of the Agreement had expired and she was already a holdover guest. (DE 141-1 pp. 14–15). Under the Holdover section of the Agreement, Defendants argue, they were entitled to deny Ms. Peterson access to the Hotel at any time. (*Id.*). The Holdover section of the agreement states the following:

> If the Lodger maintains possession of the Room for any period after the Expiration Date ("Holdover Period"), the Lodger shall pay the Hotel the Lodging Fee during the Holdover Period. Unless otherwise superseded by the laws of this State, HVM reserves the right for the Hotel to deny access to the Room to the Lodger at any time during the Holdover Period.

(DE 141-9, 2). It is clear on the face of the Agreement that if Ms. Peterson stayed in the hotel after the Expiration Date, she became a holdover guest, at which time the Defendants had the right to deny her access to her room in the Hotel. (*Id.*). The Expiration Date is defined in the Term section of the Agreement, which states in pertinent part:

---

[10]    Even assuming—which I do not—that Ms. Peterson received actual notice for the first time on September 4, 2012, that would come out to 29 days' notice, rather than 30 days' notice, before she was excluded from the Hotel on October 3, 2012. (DE 141-9, 2). Damages, if any, would presumably be *de minimis*.

> The term of this Lodging Agreement 3 . . . Months will begin at
> 3:00pm on 2/18/2009 (the "Commencement Date") and will
> terminate 3 months (90) days after that date at 11:00a.m. . . .This
> Lodging Agreement may be renewed for additional 3 months (90) day
> periods. If this Lodging Agreement is renewed, the first day of each
> renewal period shall be the Commencement Date and the thirtieth
> day shall be the Expiration Date.

(DE 141-9 p. 1). The Expiration Date was initially set to "3 months (90) days"
after February 18, 2009. (*Id.*). The Defendants assert that the Expiration Date
of the contract was therefore May 19, 2009.[11]

If nothing else occurred to change the status, Ms. Peterson would have
become a holdover guest in May 2009. It is clear, however, that the parties had
the option to renew the Agreement and extend the Expiration Date, 90 days at
a time. (*Id.*). Whether and when nonrenewal occurred may present a fact-bound
question, so I consider the effect of the Notices to Cease.

The Defendants also assume *arguendo* that the Agreement was renewed
from time to time, whether by words or by conduct. Even so, they say, Ms.
Peterson was placed on notice, and became a holdover guest, after she was
served with the Notices to Cease but did not comply with her obligations as
demanded. (DE 141-1, 14).

Beginning in March 2012, Defendants say, they provided Ms. Peterson
with adequate notice that they would not renew the Agreement and wished to
terminate. That notice took the form of Notices to Cease. (DE 141-1, 14). In
response, Ms. Peterson states that she did not receive any of the Notices to
Cease. (DE 150-5 p. 2 ¶ 1(b)).

---

[11]     Pursuant to the Term section of the Agreement, the Agreement would terminate
"3 months (90) days" after the Commencement Date. (DE 141-9, 1). The original term
of the Agreement commenced on February 18, 2009. (*Id.*). If I track the expiration date
as three calendar months from February 18, 2009, the contract initially expired on
May 19, 2009, as Defendants argue. However, if I track the expiration date as ninety
days past the commencement date, the contract expired on May 21 (not May 19).
Regardless, as discussed *infra*, I continue my analysis of the contract on the
Defendant's alternative argument that the contract expired by May of 2012.

I therefore consider two issues: (1) whether Ms. Peterson received (or must be deemed to have received) the Notices to Cease and, if so, (2) whether the Notices to Cease provided adequate notice that the Agreement would be terminated and not renewed further.

As to the first issue, I find that proper service of the Notices to Cease is governed by the Notices section of the Agreement:

> Notices under this Lodging Agreement shall not be deemed valid unless given or served in writing and forwarded by mail, postage prepaid, addressed to the party at the appropriate address set forth below. Such addresses may be changed from time to time by either party by providing notice as set forth below. **Notices mailed in accordance with these provisions shall be deemed received on the third day after posting.** Notice to a Lodger shall be deemed valid if either **personally served, delivered to address provided in the signature page or conspicuously posted on the front door of the room**.

(DE 141-9, p. 3 (emphasis added)). Within the Notices provision, Ms. Peterson's address for notices is listed as the New York PO Box. (*Id.*). Thus, on the face of the contract, if the Defendants mailed notices to Ms. Peterson at that listed address, they would be deemed received on the third day after posting. (*Id.*). Also, under the Agreement, if Defendants posted the Notices on the front door of Ms. Peterson's hotel room, notice would be deemed valid. (*Id.*).

Under New Jersey law, there is a presumption that mail properly addressed, stamped, and posted was received by the party to whom it was addressed. *SSI Med. Servs., Inc. v. State Dep't of Human Servs., Div. of Med. Assistance & Health Servs.*, 685 A.2d 1, 4 (1996). That presumption is rebuttable, and "may be overcome by evidence that the notice was never in fact received." *Goodyear Tire & Rubber Co. v. Kin Properties, Inc.*, 647 A.2d 478, 484 (App. Div. 1994).

Defendants have invoked that presumption that Ms. Peterson received the copies of the Notices to Cease that were mailed. They have provided an affidavit stating that, in the ordinary course of business, they mailed the Notices to Cease to the New York PO Box. (DE 141-34, ¶ 45) (citing DE 141-

33)). *See In re Cendant Corp. Prides Litig.*, 311 F.3d 298 (3d Cir. 2002) ("[P]roof of procedures followed in 'the regular course of operations' gives rise to a strong inference that it was properly addressed and mailed."). Ms. Peterson admits that this was her valid mailing address through 2012. (DE 141-34, ¶ 44) (citing DE 141-3, 232:12-233:6)).

Nor was mailing the only method of notice. Defendants have also certified that it was their ordinary business practice to place Notices to Cease at the guest's room door. (DE 141-34, ¶ 45) (citing DE 141-33)). The May 29, 2012 and June 27, 2012 notices list the Hotel address and the number of the room in which Ms. Peterson stayed. (DSF ¶ 45 (citing DE 141-11)).

These parties contracted for the forms of notification that would be deemed sufficient. Mailing or posting notices in the manner specified by the Agreement is contractually deemed to constitute notice. The very purpose of such a contractual proviso is to prevent a party from gaining an advantage by simply ignoring or obdurately denying receipt of communications from the other party. Under the terms of the Agreement, Ms. Peterson is deemed to have validly received the Notices to Cease. (DE 141-9 p. 3). *See Johnson & Dealaman, Inc. v. Wm. F. Hegarty, Inc.*, 93 N.J. Super. 14, 20, 224 A.2d 510, 513 (App. Div. 1966) ("By force of statute or agreement, a required notice may effectively be given if properly mailed, regardless of its receipt.")

That said, I nevertheless consider Ms. Peterson's proffered rebuttal of the Defendants' evidence of notification and the presumption of receipt. She offers no information gleaned in discovery that rebuts or even bears on the Defendants' actual sending and physical delivery of the notices. What she does offer is a bare statement that she never received any of the Notices to Cease. (DE 150-5, 2, ¶ 1(b)).[12] A bare, conclusory denial, without facts or explanation,

---

[12]     Ms. Peterson also alleges that the Defendants may not use the Notices to Cease as evidence because, in response to her information requests sent to Mash Sopariwala and a Mr. Singh (first name unknown), the Defendants responded that those individuals were no longer employed with Defendants. (DE 150-5, 3). This argument fails to provide an adequate reason, under the Federal Rules of Evidence or case law, why the Defendants may not use the Notices to Cease as evidence.

is insufficient under these circumstances. A person must at least proffer some explanation for her failure to receive material repeatedly sent to her admittedly genuine post office address, or posted at an apartment where she admittedly resided. That is particularly so here, because Ms. Peterson agreed contractually that these would constitute sufficient means of notification.

Pursuant to the procedures to which she had acceded in the Agreement, Ms. Peterson received the Notices to Cease beginning on April 1, 2012. The Agreement prescribes that a notice is deemed received three days after it was sent. (DE 141-9, 3). The first Notice to Cease, dated March 29, 2012, was therefore received on April 1, 2012. (DE 141-11, 1).

Second, I consider whether the Notices to Cease provided adequate written notice that the Defendants intended to end the arrangement and exclude Ms. Peterson from the Hotel. If the Notices to Cease did provide adequate written notice, then Ms. Peterson would become a holdover guest, at the latest, thirty days after receiving said notice.

These Notices to Cease were designed to meet the stringent requirements of landlord-tenant law. More pertinent here, however, is whether the Notices to Cease provide adequate written notice under the terms of the Agreement.[13] Under the Agreement, either party may terminate, but must provide the other with 30 days' written notice of intent to terminate the Agreement. (DE 141-9, 2). Beginning April 1, 2012, Defendants gave written notice that they would terminate the Agreement if Ms. Peterson did not "immediately" pay overdue Lodging Fees. (DE 141-11). She did not pay the requested amounts.

I pause here to note the permissible *grounds* for termination under the Agreement. The Agreement provides that, after the initial 90-day term, the

---

[13]     The Notices to Cease state that Ms. Peterson may be evicted if she does not pay her overdue rent. (DE 141-11). Under landlord-tenant law, a notice to cease may serve to advise a tenant that she will be evicted for breach of the lease, including habitual late payment without justification. *See* N.J. Stat. Ann. § 2A:18-61.1(j); *Ivy Hill Park*, 852 A.2d at 224. I note again, however, that when the Defendants attempted to bring her to landlord-tenant court, Ms. Peterson disclaimed tenant status and obtained dismissal on that basis. It is under the Agreement that she sues.

parties may elect to extend the term, and that either may terminate on 30 days' notice. Termination, for all that appear in the Agreement, may be for any reason or for no reason. Disputes over arrearages, then, while certainly pertinent to the parties, are not precisely the point.

At any rate, Ms. Peterson did not immediately make the payments demanded by Defendants, as discussed at note 15, *infra.* She was on notice that the Defendants intended to terminate the Agreement on May 1, 2012 (thirty days after the notice was received) if she did not. (DE 141-9, 1–2). Ms. Peterson remained in the Hotel after the May 1, 2012 Expiration Date. At that point, she became a holdover guest. (DE 141-9, 2). Once Ms. Peterson became a holdover guest, the Defendants could deny Ms. Peterson access to the Hotel at any time (DE 141-9, 2), which they permissibly did on October 3, 2012. (DSF ¶ 62).

Ms. Peterson counterargues that, because Defendants accepted rent from her, they cannot assert that they terminated the Agreement. (DE 150, ¶ 82(c)).[14] The Agreement, however, must be interpreted to permit the Defendants to accept payment from a holdover guest.

The Agreement, like any contract, "should not be interpreted to render one of its terms meaningless." *Porreca v. City of Millville*, 16 A.3d 1057, 1070 (App. Div. 2011). Under the Agreement, the Holdover provision presupposes cancellation of the Agreement (whether for nonpayment, or any other reason). The terms of holdover are not the same as those in the Agreement proper. The Holdover provision prescribes that the holdover guest is not entitled to remain gratis, but must pay a Lodging Fee during the holdover period. (DE 141-9, 2).

---

[14]     Under landlord-tenant law, it is true that in some instances acceptance of rent may prevent or forestall eviction. *See A.P. Development, supra; Montgomery Gateway East I v. Herrera,* 618 A.2d 865 (App. Div. 1992). However, when the landlord's reason to evict is habitual late payment, acceptance of rent does not prevent eviction. *Ivy Hill Park,* 852 A.2d at 224–225 (explaining that a landlord claiming late payment must accept late rent checks so that the landlord may create a record showing that eviction would be justified). Once again, all of that being said, Ms. Peterson has repeatedly denied that she is a tenant. (DSF ¶ 59).

By accepting that fee, the Defendants were not waiving their rights under the Agreement; on the contrary, they were exercising their contractual right to a holdover Lodging Fee.

The parties contracted for a holdover payment, once the Agreement had been terminated and the guest was in holdover status. Ms. Peterson's waiver argument would render Defendants' right to payment during the Holdover Period meaningless. I therefore reject it.

That same Holdover provision granted Defendants the right to deny access to a holdover guest whose rights under the Agreement had expired. (*Id.*). Defendants did not breach the Agreement when, on 30 days' notice, they denied Ms. Peterson access to the Hotel on October 3, 2012.[15]

For the foregoing reasons, Defendants' motion for summary judgment on the claim of breach of the Agreement is granted.

### c. Breach of the covenant of good faith and fair dealing

Ms. Peterson alleges that the Defendants breached the implied contractual covenant of good faith and fair dealing by (1) bringing the landlord-

---

[15]  Defendants argue in the alternative that they cannot be liable for breach because Ms. Peterson failed to satisfy her own contractual obligations, which were a condition of the other party's performance. *See Globe Motor Co.*, 225 N.J. at 482. Under New Jersey law, failure to make contractually required payments constitutes a material breach. *CPS MedManagement LLC v. Bergen Reg'l Med. Ctr.*, *L.P.*, 940 F. Supp. 2d 141, 151 (D.N.J. 2013). Under landlord-tenant law, too, habitual late payment or nonpayment of rent is a recognized breach. *Ivy Hill Park*, 852 A.2d at 224 (citing N.J. Stat. Ann. § 2A:18-61.1(j)).

This argument centers around Ms. Peterson's contention that her rent was frozen at the rate of $900 per month. After the expiration of the Agreement's initial 90-day term in May 2009, the Defendants would have been entitled to negotiate a higher Lodging Fee in connection with a renewed term, and under the Payment section of the Agreement, the Defendants would have been entitled to raise Ms. Peterson's rent. (DE 141-1 p. 16; DE 141-9 p. 1). In addition, the Defendants contend that they properly imposed a holdover Lodging Fee of $33/day ($990 per 30-day month), pursuant to the Notices to Cease.

Still, as I say, the dispute over the balance owing may not be central to the merits here. The Defendants were within their rights in terminating the Agreement for any reason, provided they gave notice, and, as found above, they did so.

tenant actions against her and (2) denying her access to the Hotel without adequate notice. (141-3, 294:22–295:17).

Under New Jersey law, every contract contains an implied covenant of good faith and fair dealing. *See Sons of Thunder, Inc. v. Borden, Inc.*, 690 A.2d 575 (1997). That implied covenant dictates that a party cannot act in bad faith to interfere with the other's ability to enjoy the fruits of the contract. *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121 (2001); *see also Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 225 (2005). However, "the implied covenant of good faith and fair dealing does not operate to alter the clear terms of an agreement and may not be invoked to preclude a party from exercising its express rights under such an agreement." *Fields v. Thompson Printing Co.*, 363 F.3d 259, 271 (3d Cir. 2004). Additionally, "courts have repeatedly recognized that a plaintiff cannot maintain a claim for breach of the implied covenant of good faith and fair dealing when the conduct at issue is governed by the terms of an express contract or the cause of action arises out of the same conduct underlying the alleged breach of contract." *Elite Pers., Inc. v. PeopleLink, LLC*, No. CIV.A. 15-1173, 2015 WL 3409475, at *3 (D.N.J. May 27, 2015).

Defendants argue that Ms. Peterson's good faith claims fail because they are duplicative of her breach of contract claims. (DE 141-1, p. 26). Having found that Defendants validly exercised rights expressly granted them under the Agreement, I agree. First, termination with 30 days' notice was not some clever ploy to deny a party the fruits of the contract; termination on 30 days' notice is what the parties expressly bargained for. *Elite Pers.*, 2015 WL 3409475, at *3 (D.N.J. May 27, 2015). Second, Ms. Peterson's claim that the defendants brought the landlord-tenant claims in bad faith arises out of the same conduct underlying Ms. Peterson's express-breach claim. *Id.* As discussed at Section III.b.i.1, *supra*, the Defendants acted reasonably in affording Ms. Peterson the superior rights of a tenant, and they withdrew the remaining claim when Ms. Peterson disclaimed tenant status. This sojourn in

landlord-tenant court, apparently consisting of one brief appearance, did not have the effect of denying Ms. Peterson any benefit to which she was entitled under the Agreement.

For those reasons, summary judgment is granted, and Ms. Peterson's claims under the implied covenant of good faith and fair dealing are dismissed.

### d. Tort claims

I next consider Ms. Peterson's two remaining claims: one for intentional infliction of emotional distress and the other for malicious prosecution/abuse of process. (Cplt. p. 2). Ms. Peterson's complaint alleges that the Defendants intentionally inflicted emotional distress by refusing her re-entry to the Hotel room and denying her access to her personal items until the police arrived. (*Id.*) She also asserts that the Defendants inflicted emotional distress by bringing the landlord-tenant actions against her. (*Id.*). Ms. Peterson's complaint also suggests a claim that the Defendants maliciously prosecuted Ms. Peterson in the landlord-tenant action. (*See* Cplt.).

On summary judgment, Defendants argue that the tort claims are barred by the economic loss doctrine. (DE 141-1, 28–29). Any tort claims that are not barred, Defendants argue, otherwise fail as a matter of law. (DE 141-1, 29–34).

### i. Economic loss doctrine

Defendants argue that Ms. Peterson's claims for intentional infliction of emotional distress ("IIED"), malicious prosecution, and abuse of process are barred by the economic loss doctrine because they are based on the same alleged conduct that is the basis of Ms. Peterson's breach of contract claims. (DE 141-1, 28). As to one of Ms. Peterson's IIED claims, I agree; as to the other tort claims, I do not.

The economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 605, 618 (3d Cir. 1995). *See Espaillat v. Deutsche Bank Nat. Trust Co.*, Civ. No. 15-0314, 2015 WL 2412153, at * 4 (D.N.J. May 21, 2015) (dismissing intentional infliction of

emotional distress claim that was "rooted in a contractual relationship between the parties"). In the complaint, Ms. Peterson claims that the Defendants intentionally inflicted emotional distress by denying her access to the hotel room. (Cplt. 2). However, Ms. Peterson's recovery on this IIED claim is based on her contractual right to 30 days' advance notice before being evicted. As discussed above, the Defendants did provide Ms. Peterson with the notice to which she was contractually entitled. I therefore dismiss Ms. Peterson's IIED claim regarding Defendants' denying her re-entry to the Hotel room.

I hold, however, that the remainder of the IIED claim and the claims of malicious prosecution/abuse of process are not barred by the economic loss doctrine.

### ii. Intention Infliction of Emotional Distress

Ms. Peterson asserts an IIED claim based on Defendants' institution of the landlord-tenant actions. (Cplt., 2). Such an IIED claim requires intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe. *Buckley v. Trenton Saving Fund Soc.*, 544 A.2d 857, 863 (1988). The defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.*

As discussed at Section III.b.i.1, *supra*, Defendants had a reasonable legal basis for proceeding under landlord-tenant law. Because Ms. Peterson was arguably a *de facto* tenant of the Hotel at the time, they took the precaution of granting her the substantive and procedural rights of a tenant. Bringing a landlord-tenant action was not outrageous or utterly intolerable; nor did Defendants continue to pursue it after Ms. Peterson disclaimed tenant status. Thus summary judgment is granted, and the remainder of Ms. Peterson's IIED claim is dismissed.

### iii. Malicious prosecution/abuse of process

My previous opinion extrapolated from Ms. Peterson's complaint that she intended to assert that the Defendant brought the landlord-tenant actions

against her with malice, without probable cause, and in abuse of the legal process. (DE 51, 20; *see* Cplt.). Under New Jersey law, malicious prosecution occurs in a civil action where "the [suit] was brought without probable cause . . . actuated by malice . . . plaintiffs *suffered a special grievance*, and . . . the proceeding has been terminated favorably to the plaintiff." V*enuto v. Carella, Byrne, Bain, Gilfillan, Cecchi & Stewart, P.C.*, 11 F.3d 385, 388 (3d Cir. 1973) (emphasis in original) (citations omitted). A claim of abuse of process, instead of focusing on the institution of an action, alleges "the misuse or misapplication of the legal procedure in a manner not contemplated by law." *Simone v. Golden Nugget Hotel and Casino*, 844 F.2d 1031, 1036 (3d Cir. 1988). Usually it entails "improper, unwarranted, and perverted use of process after it has been issued." *Evans v. City of Newark*, No. 14-00120 (KM) (MAH), 2016 WL 2742862, at *5 (D.N.J. May 10, 2016) (citing *Galbraith v. Lenape Reg'l High Sch. Dist.*, 964 F. Supp. 889, 897–98 (D.N.J. 1997)).

Ms. Peterson has not set forth adequate facts to support either her malicious prosecution or abuse of process claim. First, she has not set forth evidence that the Defendants brought the landlord-tenant actions with malice. In fact, the facts produced on discovery demonstrate that Defendants brought the landlord-tenant actions out of caution, arguably affording Ms. Peterson greater rights than she claimed for herself, as it turned out. Instead of simply evicting Ms. Peterson based on the terms of the Agreement, the Defendants proceeded in a manner that afforded her the protections of landlord-tenant law. *See* III.b.i.1, *supra*. Nor did the Defendants misuse or exploit the legal process thereafter. As noted several times, they simply withdrew the landlord-tenant action after Ms. Peterson's position was brought to their attention.

Thus, summary judgment is granted, and Ms. Peterson's malicious prosecution and abuse of process claims are also dismissed.

## IV.  Conclusion

For the reasons set forth above, I will GRANT the motion of ESA and HVM's motion for summary judgment and DENY Ms. Peterson's motion to stay proceedings.

An appropriate order follows.

Dated: December 27, 2018

**Kevin McNulty**
**United States District Judge**